UNITED STATES of America, Appellee,

v.

ATEHORTVA, Defendant,

Alejandro Correa, Defendant–Appellant.

No. 1612, Docket 92–1728.

United States Court of Appeals,
Second Circuit.

Argued June 4, 1993.

Decided Feb. 24, 1994.

Arthur J. Viviani, New York, N.Y., for defendant-appellant.

Geoffrey S. Mearns, Assistant United States Attorney, Brooklyn, New York (Mary Jo White, United States Attorney for the Eastern District of New York, Peter A. Norling, Assistant United States Attorney, Brooklyn, New York, of counsel), for appellee.

Before: PIERCE, WALKER and JACOBS, Circuit Judges.

PIERCE, Circuit Judge:

Alejandro Correa appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Raymond J. Dearie, Judge), following a jury trial. Correa was convicted of conspiring to possess and distribute cocaine between June, 1990 and December 20, 1990, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); of impeding federal agents in the performance of their official duties, in violation of 18 U.S.C. §§ 111(a)(1) and 111(b); and of using a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). He is currently serving a 235 month prison term to be followed by a sixty month prison term. He also was sentenced to five years of supervised release and ordered to pay a $150 special assessment.

We believe that the evidence was insufficient to support appellant's convictions on the conspiracy and firearm counts. Therefore, we reverse his convictions on those charges and remand to the district court with instructions to dismiss Counts One and Three of the indictment. The judgment of conviction on Count Two is affirmed and the matter is remanded for resentencing.

## BACKGROUND

On January 14, 1991, the Government filed a three-count indictment in the United States District Court for the Eastern District of New York charging Correa and two co-defendants, Julian Atehortva ("Julian") and Alexander Guzman ("Guzman"), with conspiracy to possess and distribute cocaine (Count One); charging Correa and Julian with impeding federal agents in the performance of their official duties (Count Two); and charging Correa and Julian with using a firearm during and in relation to a drug trafficking crime (Count Three). Correa's jury trial commenced on March 16, 1992 and concluded on March 26, 1992. Co-defendant Alexander Guzman testified for the Government along with several agents of the Federal Bureau of Investigation ("FBI") and the Drug Enforcement Agency's ("DEA") Westchester County Narcotics Task Force. The evidence, taken in the light most favorable to the Government, revealed the following.

Guzman entered the United States illegally in 1983 at the age of thirteen, and by 1988 he had become involved in narcotics trafficking. He testified that in early 1988, he agreed to "deliver a few kilos of cocaine" for the owner of the clothing store where he worked.

Thereafter, he made frequent cocaine deliveries on his employer's behalf of quantities ranging from one to ten kilograms. In 1989, he stated, at his employer's request, he transported a van which contained approximately $4,000,000 from New York City to Houston, Texas. Guzman was arrested in connection with the transportation of this money shortly after he arrived in Texas, but after posting bail, he fled to Colombia. He returned to New York a little more than a year after he had fled.

Upon his return from Colombia, in September 1990, he testified, Guzman resumed trafficking in narcotics with a new associate, Julian Atehortva. In October of 1990, Guzman began picking up cocaine from Julian's suppliers and delivering it to his customers in Queens and Manhattan. The purchasers ordinarily paid for the cocaine two to three weeks after delivery.

According to Guzman, in the first week of October, 1990, Julian asked him to help collect a $150,000 debt from Steve Zackson and Peter Lagatta, two customers who had received five kilograms of cocaine from Julian in the summer of 1990 but who had not yet paid for the drugs. Consequently, Julian, who had obtained the cocaine on consignment, had not been able to pay his supplier and the supplier had refused to provide him with cocaine.

Guzman accompanied Julian and another associate, identified as Cheo, to meet one of the customers, Steve Zackson, who promised to pay the debt in two or three weeks. When Zackson failed to pay or to keep in touch with Julian daily, as promised, Julian and Guzman met with him again to discuss the debt. At the second meeting Zackson was accompanied by Peter Lagatta. Julian refused to accept cocaine from Zackson and Lagatta in lieu of the debt but agreed to give them more time to raise the money. By the end of November, 1990, the debt still had not been paid. At that point, Julian decided that Zackson should be kidnapped, and he asked Guzman to assist in making the necessary arrangements. Julian recruited a neighbor,

who was known as El Tuso, to carry out the kidnapping. El Tuso informed Julian and Guzman that he knew a friend who would help with the kidnapping. El Tuso stated that this friend had recently arrived from Colombia and "was very good for this type of thing." That friend, according to Guzman's testimony, was Correa, the appellant herein.

Guzman testified that he and Julian met with El Tuso and Correa on at least two occasions in early December, 1990, to plan the kidnapping. According to Guzman, Julian informed him that El Tuso and Correa were to receive forty percent (40%) of the $150,000 for their services. After ruling out Zackson's home as a potential site for the kidnapping, on several occasions Guzman, El Tuso and appellant waited for Zackson at the warehouse where he and Lagatta worked. Zackson, however, never appeared at the warehouse. Rather, on December 17, 1990, Guzman saw Lagatta's car at the warehouse and Julian instructed him to kidnap Lagatta instead. Guzman, El Tuso and appellant kidnapped Lagatta from the warehouse at gunpoint and transported him to a house in Queens, which had been rented for the express purpose of holding the victim. They then contacted Zackson to demand payment of $200,000 to secure Lagatta's release.[1] Guzman recounted that, when they first arrived at the house, they "put [Lagatta] in a bedroom and right away [Guzman] started explaining the situation to him...." According to Guzman, he "told [Lagatta] that the reason [he had been kidnapped] was that he knew very well that he owed some money."

Lagatta supplied the kidnappers with Zackson's beeper number and Guzman contacted him to demand payment of the $200,000. Guzman stated that Julian was present during the conversation with Zackson but that Correa and El Tuso were with Lagatta in the basement. Zackson was unable to raise the money that day and the kidnappers agreed to wait until the following day for payment. Lagatta was moved to a first floor bedroom and that night Correa remained in the house alone with him. The following day

1. Guzman testified that, in addition to the $150,000 debt, Julian wanted $50,000 extra for "damages and expenses and interest."

Guzman and Julian returned to the house, but El Tuso decided to terminate his involvement in the scheme and did not return. Correa continued to guard Lagatta in the first floor bedroom while Guzman and Julian attempted unsuccessfully to secure payment from Zackson. On the third day, December 19, 1990, Guzman informed Zackson that he would have until the end of the day to raise the money. When Zackson told Guzman that he could not get the money, Guzman instructed him to deliver to them $50,000 and the deed to Lagatta's house, which Julian said he would hold until the balance of $150,000 was paid.

At approximately 10:00 pm on December 19, 1990, Zackson informed the kidnappers that he had obtained the $50,000 and the deed to Lagatta's house. The kidnappers, however, were unaware that several of their telephone conversations on December 19th with Zackson had been taped, with Zackson's consent, by agents.[2] Guzman instructed Zackson to meet with him and Julian at a location in Queens, and during that telephone conversation Guzman also spoke with someone who identified himself as Lagatta's cousin but who was in fact a federal agent. Guzman subsequently changed the location of the meeting from Queens to Manhattan. At the meeting, Julian waited in the car while Guzman approached Zackson's vehicle. As Zackson went into his trunk, purportedly to retrieve the money, federal agents arrested Guzman. Julian, however, escaped by driving away.

Guzman agreed to cooperate with federal agents and took them to the house in Queens where Lagatta was being held. Upon their arrival there, they noticed that Julian's car was parked outside, and shortly thereafter Julian left the house and got into the car. A short while later Lagatta and Correa also left the house and walked toward Julian's car. Shots were exchanged between the agents and Correa, who was then struck by a car driven by a federal agent to prevent him from shooting another agent at close range. Correa was eventually arrested but again Julian managed to escape.

At trial, the Government argued that Correa was guilty of conspiracy to distribute narcotics since his role in the kidnapping was intended to further his co-conspirators' ability to sell cocaine. Correa, on the other hand, offered no evidence in his defense, relying instead on the presumption of innocence. The jury convicted him on all three counts of the indictment. At sentencing, on October 19, 1992, the district judge found, over defense counsel's objections, that for sentencing purposes, the offense involved five kilograms of cocaine. He also determined that Correa's offense level should be increased by two levels under Sentencing Guidelines § 3C1.1 for obstruction of justice. Correa was sentenced to 235 months' imprisonment on Count One, the narcotics conspiracy charge, and to 120 months' on Count Two, for assaulting a federal officer; the two sentences to run concurrently. On Count Three, the firearm count, he was sentenced to an additional sixty months' imprisonment to run consecutively with the sentences imposed on Counts One and Two. The sentencing judge also imposed a five year term of supervised release and a $150 special assessment. Appellant is currently incarcerated.

## DISCUSSION

On appeal, Correa claims that the evidence was insufficient to sustain his conviction on the narcotics related charges, Counts One and Three of the indictment. Correa contends that the Government failed to prove that he knew that the planned kidnapping of Zackson or the actual kidnapping of Lagatta arose from prior cocaine dealings with Julian. All that the Government proved, he argues, was that he "joined the typical garden variety kidnapping plot: grabbing and holding a hostage until ransom is paid for his release." He argues further that his convictions on Counts One and Three of the indictment must be reversed. We agree.

We recognize that in challenging the sufficiency of the evidence underlying a conviction, a defendant bears "a very heavy burden." *United States v. Rosenthal*, 9 F.3d

---

**2.** Zackson, who had been unable to raise the money demanded for Lagatta's release, had contacted his attorney who in turn informed the FBI.

1016, 1024 (2d Cir.1993) (citations and internal quotation marks omitted). A reviewing court must view the evidence in the light most favorable to the Government to determine if " '*any* rational trier of fact could have found the essential elements of the crime [proved] beyond a reasonable doubt.' " *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir.1989) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). Furthermore, a challenge to the weight of the evidence (as opposed to its sufficiency) is "not a ground for reversal on appeal." *United States v. Roman*, 870 F.2d 65, 71 (2d Cir.), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). Even under these exacting standards of review, we are not persuaded that there was evidence presented at Correa's trial that would permit a jury rationally to conclude that he knew his actions were part of a drug distribution conspiracy.

◼ In general, to obtain a conviction on a charge of conspiracy, the Government must prove that there was an agreement between two or more participants "to achieve a particular illegal end." *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992). The participants need not be fully aware of all the details of the venture so long as they agree on the " 'essential nature of the plan.' " *Id.* at 690 (quoting *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947)). "[W]e focus on the essence of the underlying illegal objective to determine whether the conspirators agreed on 'what kind of criminal conduct was in fact contemplated.' " *Id.* (quoting *United States v. Gallishaw*, 428 F.2d 760, 763 n. 1 (2d Cir.1970)).

Appellant does not challenge the existence of the underlying narcotics conspiracy. We note that Guzman's testimony, if credited by the jury, would provide sufficient evidence of the existence of such a conspiracy. Guzman testified that because Zackson and Lagatta had not paid Julian the money they owed, "Julian couldn't work and a lot of business had been lost." One may clearly infer that the underlying purpose of the kidnapping was to allow Julian to pay his suppliers so that he could obtain more cocaine to sell. Appellant argues that the evidence was insufficient to allow the jury to conclude that *he* knowingly participated in the underlying conspiracy with the intent to further its objective to distribute narcotics.

◼ Once the existence of a conspiracy has been established, "evidence sufficient to link [a] defendant to it need not be overwhelming." *United States v. Rivera*, 971 F.2d 876, 891 (2d Cir.1992) (citations and internal quotation marks omitted). Further, a defendant's knowledge and participation in a conspiracy with the requisite criminal intent may be demonstrated by circumstantial evidence. *See, e.g., United States v. Villegas*, 899 F.2d 1324, 1338–39 (2d Cir.), *cert. denied*, 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990). However, there must "be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir.1989) (citations and internal quotation marks omitted).

◼ The Government contends that the evidence was sufficient to establish Correa's knowing participation in the narcotics conspiracy. That knowledge, it asserts, is demonstrated by evidence that (1) "Correa was known among Colombian cocaine traffickers as an experienced 'enforcer;' " (2) Correa must have known that Julian was a drug dealer since he and El Tuso were to be paid a fixed percentage of the debt they were helping to collect; and (3) prior to the kidnapping, Correa met with El Tuso, Guzman and Julian on several occasions, and "[p]resumably, therefore, Julian and 'El Tuso' had informed Correa as to the underlying reason for the kidnapping." (Footnote omitted).

The Government supports its contention that Correa was a known enforcer by pointing to Guzman's testimony that he and Julian were told by El Tuso that Correa "was very good for this type of thing." The Government also highlights Guzman's belief that

Correa had been involved in similar activities in Colombia. We are not convinced that this testimony, taken in context, demonstrates that Correa "was known among Colombian cocaine traffickers as an experienced 'enforcer.'" In fact, Guzman testified that neither he nor Julian knew Correa before El Tuso recruited him to help with the kidnapping. Moreover, he testified that he had never previously met El Tuso, whom he understood to be Julian's neighbor, before the kidnapping plot was set in motion. Guzman's testimony fairly indicates that El Tuso was recruited by Julian specifically to carry out a kidnapping, and that in turn El Tuso recruited Correa to help him with that specific task. However, the fact that Guzman and Julian knew the kidnapping was drug-related does not provide sufficient evidence that Correa knew his activities involved narcotics, nor that the "type of thing" El Tuso claimed that Correa was good for was anything other than kidnapping for ransom.

The Government's argument that "Correa must have known Julian was a cocaine dealer" because of the fee arrangement for the kidnapping is also unavailing. Guzman testified that he never spoke with El Tuso or Correa about the fee, but he was told by Julian that they were to receive 40% of the $150,000 owed—or approximately $60,000. Guzman stated that he did not know how El Tuso and Correa planned to divide this sum. He also testified that after El Tuso withdrew from the scheme, Julian informed him that Correa would receive the 40%, and, in addition, any money collected over $150,000.

The Government argues that Correa must have known that Julian sold cocaine because his fee was "directly linked to the amount of money recovered from the two debtors." The Government can point to no evidence, however, that Correa knew about the underlying debt or that his fee was related to it. For example, Guzman testified that although he was not present when the fee was discussed, Julian told him that he had negotiated the fee arrangement with El Tuso. The Government, in turn, introduced no evidence

concerning what information, if any, El Tuso or Julian may have communicated to Correa. In short, there is insufficient evidence, beyond speculation, that Correa knew of the existence of the $150,000 debt, or that he knew or should have known that the debt resulted from a narcotics transaction.[3]

Nor does Guzman's testimony concerning the pre-kidnapping meetings between himself, Julian, El Tuso and Correa bolster the Government's position that Correa must have been informed of the underlying reason for the kidnapping. Guzman testified at length about these meetings, and, significantly, he did not indicate that drugs were discussed. According to Guzman, the parties merely discussed various aspects of the kidnapping plot, such as what weapons to use, and where and how to carry out the kidnapping. Even after Lagatta had been kidnapped, there was no evidence that drugs were ever discussed in Correa's presence. Moreover, the fact that Correa may have spent large amounts of time alone with Lagatta provides no evidence that Lagatta explained the reason for the kidnapping to Correa, especially since there was testimony indicating that Lagatta did not speak or understand Spanish and Correa spoke little English.

Our review of the record reveals none of the circumstantial indicia of knowledge of conspiracy that we have previously held may provide sufficient evidence to sustain a conviction for conspiracy. For example, there was no evidence of past narcotics related activity on Correa's part, see *United States v. Calbas*, 821 F.2d 887, 892 (2d Cir.1987), cert. denied, 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988), nor was there evidence of incriminating conversations between Correa and his alleged co-conspirators. See *United States v. Chang An–Lo*, 851 F.2d 547, 554–56 (2d Cir.), cert. denied, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). We also note that there were no drugs recovered at the house where Lagatta was being held. See *United States v. Rios*, 856 F.2d 493, 496 (2d Cir.1988) (per curiam).

---

**3.** Guzman testified that as soon as they arrived at the rented house in Queens where Lagatta was held, he told Lagatta "that the reason we had him was that he knew very well that he owed some money." It is unclear whether Correa was present during this discussion and, in any event, there is no indication that drugs were ever mentioned in connection with the debt.

This is not a case in which there is no other plausible explanation for the appellant's actions. There is certainly sufficient evidence to indicate that appellant knowingly participated in a kidnapping. There is not, however, sufficient evidence to allow a jury rationally to conclude that appellant "knew of the existence of the [cocaine conspiracy] and knowingly joined and participated in it." *Nusraty,* 867 F.2d at 763 (citations and internal quotation marks omitted). Even if we were persuaded that appellant knew there was a debt owed to Julian by Zackson and Lagatta and that recovery of the debt was the purpose of the kidnapping, we find no evidence that demonstrates beyond a reasonable doubt that he knew the debt was related to drug trafficking. His "association with those implicated in an unlawful undertaking is not enough to prove knowing involvement." *Id.* at 764 (citations omitted). The evidence is insufficient, therefore, to link appellant to the narcotics conspiracy, and thus, his conviction on the conspiracy count, Count One, must be reversed.

Because the evidence was insufficient to demonstrate that Correa knew his actions were related to a narcotics conspiracy, his conviction on Count Three, the firearm count, must also be reversed. Count Three of the indictment under which Correa was charged provides in pertinent part:

> On or about and between December 17, 1990 and December 20, 1990, ... the defendant[] .... ALEJANDRO CORREA ... did knowingly and intentionally use and carry a firearm during and in relation to a drug trafficking crime, to wit: conspiring to distribute and to possess with intent to distribute cocaine, the offense charged in Count One of this indictment.

An essential element of the crime charged in Count Three was that the firearm be used and carried "during and in relation to any ... drug trafficking crime." 18 U.S.C. § 924(c)(1) (1988 & Supp. IV 1992). The only drug trafficking crime that Correa was alleged to have committed was conspiracy to possess and distribute cocaine as charged in Count One of the indictment. As we have already determined, the Government failed to prove Correa's knowing participation in the cocaine distribution conspiracy. We

therefore conclude that the Government failed to prove an essential element of the firearm charge and Correa's conviction on that charge cannot stand. *See United States v. Javino,* 960 F.2d 1137, 1141 (2d Cir.) ("If the evidence at trial was insufficient to prove [an element of the crime] we must reverse and order dismissal of that count.") (citing *Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978)), *cert. denied,* — U.S. ——, 113 S.Ct. 477, 121 L.Ed.2d 383 (1992).

Appellant does not challenge his conviction on Count Two of the indictment, which charged him with assaulting and interfering with federal officers "while engaged in and on account of the performance of their duties." Thus, no issue is before us regarding his conviction on that count. Also, we need not address the sentencing issues appellant raises since the case must be remanded to the district court for resentencing.

### CONCLUSION

Accordingly, appellant's convictions on Counts One and Three are reversed and the matter is remanded to the district court with instructions to dismiss those counts; the judgment of conviction as to Count Two is affirmed and the matter is remanded to the district court for resentencing.