UNITED STATES of America,
Appellee,

v.

Stefan IRVING, Defendant–Appellant.

Docket No. 04–0971–CR.

United States Court of Appeals,
Second Circuit.

Argued Dec. 8, 2004.

Decided: Dec. 23, 2005.

402

Cheryl J. Sturm, Chadds Ford, Pennsylvania, for Defendant–Appellant.

Michael Y. Scudder, Jr., Assistant United States Attorney, New York, New York (David N. Kelley, United States Attorney, Karl Metzner, Assistant United States Attorney, Southern District of New York, New York, New York, of counsel), for Appellee.

Before: CARDAMONE, JACOBS, and CABRANES, Circuit Judges.

Judge CABRANES concurs in part, and dissents in part, in a separate opinion.

CARDAMONE, Circuit Judge.

Defendant Stefan Irving (defendant or appellant) was convicted, among other crimes, of traveling abroad for the purpose of engaging in sexual acts with minors. The conviction arose from defendant's trips to Mexico and Honduras. The proof of the travel to Mexico and its purpose was strong. But, only the proof of travel to Honduras was established, the proof of its purpose came from uncorroborated writings in defendant's personal journal. It is a well-established principle that a conviction in criminal law must stand on firmer ground than an uncorroborated admission by defendant. Corroboration maintains sound law enforcement by requiring that police investigation of an alleged criminal offense extend beyond the words of the accused. Because proof of defendant's purpose for the trip on the charged offenses was insufficient, defendant's conviction on the Honduras counts cannot stand.

Irving appeals from a judgment entered on February 23, 2004 in the United States District Court for the Southern District of New York (Kaplan, J.) convicting him, following a jury trial, of two counts of traveling outside the United States for the purpose of engaging in sexual acts with children under the age of 18, in violation of 18 U.S.C. § 2423(b); one count of traveling outside the United States for the purpose of engaging in sexual acts with children under the age of 12, in violation of 18 U.S.C. § 2241(c); one count of receiving images of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B); and one count of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Following his conviction on all counts, Irving received a sentence of 262 months of imprisonment followed by 60 months of supervised release, a $200,000 fine, and a $500 special assessment. He appeals from his judgment of conviction and his sentence.

For the reasons stated below, we affirm defendant's conviction on count one, traveling to Mexico in violation of 18 U.S.C. § 2423(b) and counts four and five, receiving and possessing images of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(B) and (a)(5)(B). We vacate, however, defendant's conviction on count two, traveling to Honduras in violation of 18 U.S.C. § 2423(b) and count three, traveling to Honduras in violation of 18 U.S.C. § 2241(c) and remand for resentencing.

BACKGROUND

A. *Facts*

Defendant is a former chief pediatrician for the Middletown, New York school district. On April 29, 1983 while employed as school physician, he was convicted of attempted sexual abuse in the first degree of a seven-year-old boy that resulted in the revocation of his license to practice medicine in New York, and a sentence of 16 to 48 months imprisonment. Thirteen years later in 1996, the federal government initiated a nationwide investigation of individuals suspected of traveling to Mexico for the purpose of engaging in sexual acts with children. Defendant became a target of that investigation which ultimately led to the criminal proceedings before us on this appeal.

B. *1998 Mexico Trip*

In May 1998 Irving traveled to Acapulco, Mexico to visit Castillo Vista del Mar, a guest house that served as a place where men from the United States could have sexual relations with Mexican boys. When defendant visited, seven or eight boys

ranging in age from eight to 20 years old were residing there. Irving learned of Castillo Vista del Mar from Robert Decker—its then manager, and a friend from the 1970s.

Decker testified that prior to visiting, Irving asked if specific boys—whom he knew from previous visits—would be there. Decker said Irving specifically asked about an eight-year-old boy. Decker testified further that he saw Irving fondle some of the boys who lived at the guest house while swimming with them. He also stated he saw defendant go upstairs to his bedroom at various times with different boys. Decker said that during Irving's visit the two of them discussed a previous trip to Honduras that Irving had taken, trips to the beaches he took while there, and the boys he met. One of the boys at the guest house when Irving visited, Jesus Santiago Percastegui, corroborated relevant portions of Decker's testimony. Although unable to identify Irving in court, this witness stated that he saw "Esteban" (the name by which he knew Irving) at the beach caressing two other boys that lived at the guest house and twice go upstairs to his room with them.

Decker admitted while he was in Mexico he experienced financial difficulties, and that Irving gave him ATM cards, connected to an account he funded, up until Decker's September 2000 arrest. Irving gave Decker over $5,000 in support over the years. The two men also communicated regularly. Irving provided Decker with Internet web addresses of sites containing child pornography and on one occasion gave him images of boys engaged in sex acts with each other, with men, or by themselves. Irving told Decker he preferred prepubescent boys, under the age of 11, and that he preferred oral sex or fondling.

Upon returning to the United States from Mexico on May 27, 1998 through the Dallas–Fort Worth Airport, defendant was stopped by United States Customs inspectors. This search was prompted by Special Agent Robert Casey who was in California investigating Irving. Special Agent Casey directed Special Agent Edwin B. Rehkopf, stationed at the Dallas–Fort Worth Airport, to search and interview Irving upon his arrival there.

The initial search of Irving's luggage revealed children's books and drawings that appeared to be drawn by children, but nothing necessarily incriminating. Nonetheless, the Customs agents questioned defendant further. Defendant admitted he was a convicted pedophile, but denied having visited Decker. Instead, he told the agents he had visited another friend. A second search of Irving's luggage revealed a disposable camera and two 3.5 inch computer diskettes, which the agents said they would need to examine. Irving denied having any child pornography on either the diskettes or the camera and refused to sign a Customs form consenting to their seizure. The film Irving was carrying turned out to have pictures taken at Castillo Vista del Mar of the defendant with Decker and with boys. Images of child erotica were found on the diskettes.

### C. *Arrest and Search of Defendant's Home*

Jerome A. Coleman, a special agent of the United States Bureau of Immigration and Customs Enforcement (BICE), and other BICE agents arrested Irving five years later at his apartment in Brooklyn on May 6, 2003. While executing the arrest warrant at the apartment, Agent Coleman observed a personal computer and monitor. Based upon his 15 years of experience and formal training concerning the importation and distribution of child pornography, Agent Coleman knew that pedophiles often use computers to commu-

nicate and to exploit children, by making travel arrangements on the Internet to facilitate travel with the intention of engaging in sex acts with children or sharing data with other pedophiles that involves the exploitation of children.

Existence of the computer and other information led him to apply for a search warrant for defendant's apartment. In a supporting affidavit, Agent Coleman listed a number of reasons for his suspicion that Irving's apartment and specifically his computer might contain evidence of child exploitation. First, he relied on Decker's statements, which indicated that: (1) Irving used his home and office computers to communicate with fellow boy lovers and to send and receive pornographic pictures depicting children engaged in sexual acts; (2) Irving's purpose in visiting Mexico, and specifically Castillo Vista del Mar, was to engage in sex with boys; and (3) Irving photographed boys he found attractive in Mexico, but was careful to destroy incriminating pictures before returning to the United States. Second, Coleman explained that pedophiles often use their computers to facilitate the exploitation of children. Third, he noted that Irving's work computer did not contain any incriminating material, thus suggesting, on the basis of Decker's statements, that such materials would be found on Irving's home computer. Fourth, he enumerated the items found in Irving's luggage at the Dallas–Fort Worth Airport in 1998, and noted defendant's prior conviction for attempted sexual abuse in 1983. Fifth, Agent Coleman stated that three children who had spent time at Castillo Vista del Mar identified Irving (from a photograph) as one of the men at the guest house who had sexually abused boys while there. Sixth, he described the contents of various letters Irving wrote discussing exploitation of children that had allegedly already occurred, or that Irving hoped would occur, one of which was dated as recent as 2001. Based

on this affidavit a magistrate judge in the Eastern District of New York issued a search warrant two days later on May 8, 2003 for Irving's apartment.

Armed with the warrant, BICE agents searched and seized there, among other things, Irving's home computer, which contained 76 video files, or MPEG files. The trial judge allowed, over defendant's objection, two of these video files to be played for the jury for a minute or less each. Agent Coleman explained they revealed "prepubescent boys engaging in various sexual acts with each other and in other cases of sexual acts by themselves." The agent further testified that all 76 files contained essentially the same content as that revealed in the two files played for the jury.

### D. *1999 Honduras Trip*

During the search of Irving's apartment agents discovered Irving's passport, which showed a visit to Honduras on January 1, 1999. Defendant's bank records reflected a cash withdrawal from his account on January 4, 1999 in La Ceiba, Honduras, and his employment records indicated he was on vacation from January 1 to January 10, 1999. Although at trial Irving never explicitly admitted to being in Honduras during this period, his personal journal covering those dates discusses a trip from the United States to Honduras and details his activities while there, particularly his luring of a 12–year–old boy back to his hotel with him and the sexual activities in which they engaged.

The journal also mentions meetings with other children, the weather, getting in and out of the country, food, and other innocuous topics. The January 4, 1999 journal entry describes his attempts to make a bank withdrawal on that date in La Ceiba. The journal, employment records, bank statement, and passport constitute all of

the government's evidence that defendant traveled to Honduras, and that he did so for the purpose of engaging in sexual acts with children.

### E.  Trial Proceedings

Two months prior to the start of Irving's trial on September 23, 2003 defendant moved to suppress all evidence that was obtained (1) pursuant to the May 8, 2003 search warrant, (2) through photo identifications of defendant by children in Mexico, (3) from Irving at the Dallas–Fort Worth Airport, including information from his statements to Customs agents, and (4) from defendant's correspondence or photographs regarding minors produced at any time other than those times referred to in the superseding indictment.  The district court denied the suppression motion.

At the close of the trial the jury convicted defendant on all counts.  Irving then unsuccessfully filed a motion for a new trial on October 22, 2003.  The district court sentenced him to 262 months imprisonment on each count, to run concurrently, five years of supervised release, a $200,000 fine, and a $500 special assessment.  This appeal ensued.

### DISCUSSION

Irving raises a number of issues on appeal, most of which we find unavailing. Yet, because of insufficient proof of guilt on the two counts involving defendant's trip to Honduras, we must vacate the conviction on those counts, while affirming his conviction on all the other counts.  In light of our vacating of the Honduras travel counts, we also must vacate defendant's sentence and remand this case to the district court for resentencing.  We turn to an analysis of the issues.

### I Sufficiency of Proof

Irving contends the district court erred in denying his Fed.R.Crim.P. 29(c) motion for a judgment of acquittal because the government proffered insufficient evidence to support counts one through three, which charged him with:  traveling to Mexico with intent to engage in sexual acts with minors (count one); traveling to Honduras with intent to engage in sexual acts with minors (count two); and traveling to Honduras with intent to engage in a sexual act with a person not yet 12 years of age (count three).

### A.  Rule 29

Rule 29(c)(2) states that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  Fed.R.Crim.P. 29(c)(2).  A Rule 29 motion should be granted only if the district court concludes there is "no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt."  *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972).

■■■ To succeed on his challenges regarding sufficiency Irving carries a heavy burden, and must show that when viewing the evidence in its totality, in a light most favorable to the government, and drawing all inferences in favor of the prosecution, no rational trier of fact could have found him guilty.  *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Gaines*, 295 F.3d 293, 299–300 (2d Cir.2002).  A jury may convict on circumstantial evidence alone.  *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir.1995).  On appeal, we review the disposition of the Rule 29(c) motion *de novo*, applying the same standards as the district court.  *United States v. Reyes*, 302 F.3d 48, 52–53 (2d Cir.2002).

According to Irving the evidence was insufficient on count one, the Mexico travel count, and on counts two and three, the Honduras travel counts, because his convictions on these counts improperly relied

on uncorroborated writings in his personal journal. With respect to defendant's Mexican trip there was ample evidence, including Decker's testimony and Jesus Percastegui's testimony, as well as pictures of Irving with children in Mexico, on which the jury could rely to convict him. With regard to counts two and three, Irving's arguments are more persuasive and his conviction more problematic because the only proof that appellant took this trip for the purpose of engaging in sexual acts with minors are the uncorroborated statements found in his travel journal. To decide the merits of Irving's argument, we must turn to an examination of the corroboration rule.

### B. Corpus Delicti/*Corroboration Rule Issue*

■ Traditionally, the corroboration rule, historically termed the *corpus delicti* rule, applied only to a defendant's confession, but over time has been expanded to apply to admissions and exculpatory statements. *See* 1 John W. Strong, *McCormick on Evidence* § 145, at 521 (5th ed.1999); *see also Opper v. United States*, 348 U.S. 84, 90–91, 75 S.Ct. 158, 99 L.Ed. 101 (1954) (holding that "accused's admissions of essential facts or elements of the crime, subsequent to the crime, are of the same character as confessions and that corroboration should be required"). Historically, and still in many jurisdictions, courts adhering to the corroboration rule demanded that prosecutors present evidence other than the defendant's confession, admission, or exculpatory statement to prove the *corpus delicti* or "body of the crime." Strong, *supra*, § 145, at 525. Generally, the *corpus delicti* is understood to include the actual injury or harm, i.e., the dead body in a murder case, and proof that the harm or injury was caused by defendant's criminal activity. *Id.*

■ In *Opper,* the Supreme Court rejected this traditional understanding of the *corpus delicti* rule, and held instead that the corroborating evidence need not prove the essential elements of the crime. *See* 348 U.S. at 93, 75 S.Ct. 158. Rather, the corroboration must prove that the confession was reliable, and must prove any elements of the crime to which the defendant did not confess. But the confession, if proven reliable, may serve as the only evidence reaching the *corpus delicti. See id.* at 93–94, 75 S.Ct. 158; *see also Smith v. United States,* 348 U.S. 147, 156, 75 S.Ct. 194, 99 L.Ed. 192 (1954) ("All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused."). Although the corroborative evidence need not independently prove the injury or harm resulting from the crime, it must "support[ ] the *essential* facts admitted sufficiently to justify a jury inference of their truth." *Opper,* 348 U.S. at 93, 75 S.Ct. 158 (emphasis added).

In applying *Opper,* we have held: "[T]he modern corroboration rule requires only that there be 'substantial independent evidence which would tend to establish the trustworthiness of the statement.'" *United States v. Bryce,* 208 F.3d 346, 354 (2000). The corroboration rule thus serves a "gatekeeping function" in that it prevents juries from convicting on unreliable evidence. *Id.*

For purposes of the corroboration rule, there are two types of confessions or admissions:

those that bear insufficient indicia of reliability as proof of the defendant's commission of the offense to support a finding of guilt beyond a reasonable doubt, and those that, considering the

nature and the context of the defendant's words, demonstrate his commission of the offense so reliably that, without need of other supporting evidence, they can support a finding of guilt beyond a reasonable doubt.

*Id.* at 355. Some examples of self-corroborating statements—statements so reliable in and of themselves that they require no corroborative evidence—are statements made prior to the commission of the crime, *see Warszower v. United States,* 312 U.S. 342, 347, 61 S.Ct. 603, 85 L.Ed. 876 (1941), and statements made between co-conspirators to accomplish the ends of their criminal enterprise, *see United States v. Simmons,* 923 F.2d 934, 954 (2d Cir.1991).

■ Defendant's Honduras journal does not fall into any of the previously existing categories of self-corroborating statements. Nor does its nature and context suggest that we should consider it self-corroborating. Although there may be some external indications the journal is reliable—primarily appellant's bank visit reflected in his bank records and his discussion of a visit to the bank in the journal on the same day, and the general detail and narrative quality of the journal—these indicia relate to the question of whether the journal was sufficiently corroborated, not to whether it was the type of statement that required no corroboration. We have never held that the level of detail of a confession or admission should determine its reliability, and decline to do so in this case. For all the journal shows, the narrative of child molestation may as easily be a record of fantasies as of events that actually transpired. Thus, we conclude the journal falls into that category of admissions or confessions requiring corroboration.

■ To corroborate Irving's journal, the prosecution had to produce "substantial independent evidence which would tend to establish the trustworthiness of the statement," *Opper,* 348 U.S. at 93, 75 S.Ct. 158,

specifically with respect to those portions relating to the elements of Irving's alleged crime—traveling with the intent to engage in sexual acts with minors. In its brief to this Court, the government suggests the following evidence corroborated Irving's journal: (1) Decker's testimony that Irving had sexual interests in young boys, that he traveled to foreign nations to act on those interests, and that Irving had discussed a prior trip to Honduras and the boys he met there with Decker; (2) Irving's employment records and his passport, which showed he traveled to Honduras on the relevant dates; (3) Irving's behavior on the Mexico trip; and (4) the bank record showing a withdrawal in La Ceiba, Honduras on January 4, 1999, corresponding to the journal entry on that date discussing a trip to the bank in La Ceiba.

We are unpersuaded that such evidence corroborates defendant's journal. Irving's statements to Decker and his prior writings cannot corroborate his Honduras journal because those statements are themselves uncorroborated admissions. *See United States v. Calderon,* 348 U.S. 160, 165, 75 S.Ct. 186, 99 L.Ed. 202 (1954) (explaining that statements themselves uncorroborated "cannot serve to corroborate respondent's other admissions"). The passport and employment records are circumstantial evidence that Irving traveled to Honduras, but alone they are insufficient to corroborate all the statements in his journal. Nor does Irving's behavior in Mexico corroborate the statements in his Honduras journal. Although the acts may be similar, those occurring in Mexico do not corroborate a writing discussing acts occurring in a different country at a different time. *Cf. Bryce,* 208 F.3d at 352, 356 (statements were uncorroborated, even though there was evidence that acts similar to those admitted to in the statements occurred within months of the statements).

If the crime charged was travel to Honduras, the government's proffered corroborative evidence might well have been sufficient because it would have corroborated the essential elements of that hypothetical crime. However, the crime charged was traveling to Honduras with intent to engage in sexual activities with minors. The government failed to present any evidence corroborating the essential elements of this crime that were admitted in the journal. Absent such corroboration, the journal is not sufficiently corroborated "to justify a jury inference of [its] truth." *Opper*, 348 U.S. at 93, 75 S.Ct. 158.

That said, the dissent's prediction of "baleful consequences" flowing from our application of the corroboration rule here is unfounded. Our holding does not preclude the government from relying on statements made by an accused as to intent absent evidence of specific acts. Nothing in our holding prevents the government from using statements of an accused *so long as* they are self-corroborating or satisfy the corroboration rule. As we discuss at length elsewhere, Irving's journal is not self-corroborating nor is its trustworthiness corroborated by substantial independent evidence. Principled application of the corroboration rule compels us to preclude reliance on defendant's journal with respect to the Honduras counts. Our dissenting colleague, applying that rule to these facts in a fashion no less principled, draws the opposite conclusion.

Thus, although Irving's burden with respect to sufficiency of the evidence is weighty, we think it has been met in this case. Even viewing the evidence in its totality and drawing all inferences in favor of the government, the evidence is insufficient to allow any reasonable juror to find defendant guilty on counts two and three beyond a reasonable doubt. Our conclusion is based on an analysis that is one of degree. If the government offered corroboration of *most* of the journal, or corroborated critical parts of Irving's writings about children—for example, by offering the testimony of hotel managers whom Irving wrote objected when they found he had brought children to his hotel room— we might conclude that a reasonable jury could find defendant's journal entries trustworthy. Without such corroboration, however, the district court erred in failing to grant Irving's Rule 29 motion with respect to those counts, and we must therefore vacate appellant's conviction on them.

## II Receiving and Distributing Pornographic Materials (Counts Four and Five)

Irving additionally maintains there was insufficient proof for the jury to convict him on count four, which charged him with receiving and distributing material that contains child pornography in violation of 18 U.S.C. § 2252A(a)(2)(B), and count five, which charged him with possession of an image containing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Irving's argument is that (1) the government failed to proffer evidence beyond the videos themselves to prove that the children in the videos were in fact real children, and (2) there was no proof that he willfully downloaded the images onto his computer. Although the trial court carefully instructed the jury using a constitutionally permissible definition of child pornography, Irving contends the jury may have convicted him for possession and receipt of child pornography that did not contain real children and thus might have violated his First Amendment right to freedom of speech. We use the same sufficiency of the evidence standard set forth earlier to determine whether Irving's challenge with respect to counts four and five should succeed.

## A. *Extrinsic Evidence of Use of Real Children*

■ To convict Irving under counts four and five the prosecution had to show that appellant knowingly received or possessed materials containing child pornography. *See* 18 U.S.C. § 2252A(a)(2)(B) and (a)(5)(B). Accordingly, Irving insists the prosecution was required to prove, by expert testimony, that the 76 video files depicted real, as opposed to virtual, children. It is well established that a statute which prohibits a substantial amount of protected speech, is unconstitutional on its face. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). Yet freedom of speech is not completely without bounds. Certain categories of speech such as defamation, incitement, obscenity, and pornography produced using real children, may be barred without trespassing on individual First Amendment rights. *See id.* at 245–46, 122 S.Ct. 1389.

In *Free Speech Coalition* the Supreme Court ruled that two of the definitions of child pornography adopted by the Child Pornography Prevention Act of 1996(Act), 18 U.S.C. § 2251, *et seq.*, were overbroad and hence violated the First Amendment on their face. *See* 535 U.S. at 258, 122 S.Ct. 1389. The first, § 2256(8)(B), defined child pornography as a "visual depiction [that] is, or appears to be, of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(B) (1996) (invalidated 2002, amended 2003). The second, § 2256(8)(D), defined child pornography as a "visual depiction [that] is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(D) (1996) (invalidated 2002, amended 2003). The "appears to

be" and "in such a manner that" language, the Supreme Court held, reached constitutionally protected speech because these phrases did not restrict the definition of child pornography to obscene material or to material that was itself the product of sexual abuse. *See Free Speech Coal.*, 535 U.S. at 240, 251, 122 S.Ct. 1389 (citing *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), which defines obscenity, and *New York v. Ferber*, 458 U.S. 747, 761, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), which holds that states may constitutionally prohibit the creation or promotion of child pornography not meeting the *Miller* standard).

■ Obscene material is that which taken as a whole, appeals to the prurient interest, is patently offensive in light of community standards, and lacks serious literary, artistic, political, or scientific value. *See Miller*, 413 U.S. at 24, 93 S.Ct. 2607. In *Free Speech Coalition*, the Court explained that states may prohibit child pornography that fails to meet the *Miller* obscenity standard if it is the product of sexual abuse of actual children. 535 U.S. at 249, 122 S.Ct. 1389. In his brief to this Court, Irving urges that the holding of *Free Speech Coalition* necessarily created a bright-line rule requiring the government to present evidence, other than the unlawful images themselves, to prove beyond a reasonable doubt that the pictures were created using real children. A careful reading of the Supreme Court's opinion does not support Irving's view of it. Although the Supreme Court noted the possible evidentiary difficulty of distinguishing virtual and actual child pornography, it did not establish a bright-line rule requiring that the government proffer a specific type of proof to show the use of an actual child. *Id.* at 254–56, 122 S.Ct. 1389.

Nor does Irving's interpretation of *Free Speech Coalition* find support in our sister circuits. Since the First Circuit vacated its decision in *United States v. Hilton*, 363 F.3d 58 (1st Cir.), *vacated*, 386 F.3d 13 (1st Cir.2004), which had adopted a rule similar to the one Irving urges us to adopt, it now appears that none of the circuits that have addressed the effect of *Free Speech Coalition* on the government's burden of proof in child pornography prosecutions has adopted the bright-line rule pressed by Irving in this case; that is, that *Free Speech Coalition* increased the government's burden of proof regarding the actuality requirement.

The Eighth Circuit, for example, has declined to alter its previous rule—that it would uphold "a jury's conclusion that real children were depicted even where the images themselves were the only evidence the government presented on the subject"—following *Free Speech Coalition*. *United States v. Deaton*, 328 F.3d 454, 455 (8th Cir.2003) (per curiam). The Fifth, Sixth, and Tenth Circuits agree that *Free Speech Coalition* does not lay down "the absolute requirement that, absent direct evidence of identity, expert testimony is required to prove that the prohibited images are of real, not virtual, children." *United States v. Kimler*, 335 F.3d 1132, 1142 (10th Cir.2003); *see United States v. Farrelly*, 389 F.3d 649, 653–54 (6th Cir. 2004); *United States v. Slanina*, 359 F.3d 356, 357 (5th Cir.2004) (per curiam).

We have not had occasion to address the effect of *Free Speech Coalition* on the government's evidentiary burden with respect to the actuality requirement. On the basis of the facts of this case and our own interpretation of *Free Speech Coalition*, we reject Irving's claim that the government must present extrinsic evidence. Although Irving's objections to the presentence investigation report included a claim that the government failed to carry its burden of proving beyond a reasonable doubt that certain images did contain real children, appellant points to no evidence suggesting that the images were not created using actual children. Further, the superseding indictment specifically made reference to the constitutionally valid definition of child pornography

any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—

(A) the production of such visual depiction involves *the use of a minor* engaging in sexually explicit conduct;

18 U.S.C. § 2256(8)(A) (emphasis added). And, as the same definition was used by the trial court in its charge, the jury understood that it should not vote to convict unless it found the images were made using real children.

Moreover, it does not appear that video technology is so far advanced that a jury is incapable of determining whether a real child was used to make a video. *See Kimler*, 335 F.3d at 1142; Susan S. Kreston, *Defeating the Virtual Defense in Child Pornography Prosecutions*, 4 J. High Tech. L. 49, 60–61 (2004); *see also United States v. Pabon–Cruz*, 255 F.Supp.2d 200, 207 (S.D.N.Y.2003), *vacated in part on other grounds*, 391 F.3d 86 (2d Cir.2004) (stating that "jurors [can] draw on their own common sense and experience to recall that the most expensive digital special effects Hollywood can command only rarely generate images that can be confused with live human actors"). Even the most technologically advanced films created without the use of real people are distinguishable from those created with real people. Kreston, *supra*, at 60.

Hence, we decline to hold the government is required, after *Free Speech Coali-*

*tion,* to present expert testimony proving the children in the unlawful images are in fact real children. Yet, we restrict today's holding to cases that present facts similar to those before us, that is, cases involving video images or MPEGs. Moreover, we are not shifting the burden of proof regarding the images onto defendant. The government must still prove the images were created using real rather than virtual children. But where, as here, the video images are such that confusing them with images of virtual children is highly unlikely—and, in any event, the defendant never actually argued that the images contained only virtual children—a reasonable jury could conclude that the images depicted real children solely on the basis of the images themselves. Consequently, Irving has not carried his heavy burden of proving the evidence was not sufficient to convict.

### B. *Willfully Downloaded Issue*

■ Irving next contends the government failed to prove he willfully downloaded and stored images containing child pornography on his home computer. Although he concedes the images were on his computer, he maintains the government was not able to exclude the very real possibility that someone else put the images on the hard drive. In support of this assertion, defendant notes Agent Coleman recognized it was not Irving's usual practice to save, rather than to destroy, incriminating evidence.

This assertion has no merit. First, the government was only required to prove that Irving knowingly—not willfully—received or possessed the images. *See* 18 U.S.C. § 2252A(a)(2)(B) and (a)(5)(B). Second, ample evidence was presented to the jury from which it could find Irving knowingly received and possessed the images: There were 76 files containing such images on his computer; they were stored in the My Documents folder; someone was

at Irving's home and on the Internet on the days that the images were downloaded; and Irving was not working on those days. Perhaps even more importantly, Irving made no showing that someone else lived at his apartment, or had access to his computer on the relevant dates. Drawing all inferences in favor of the prosecution, we conclude that a rational juror could find that the government proved all elements of the crime beyond a reasonable doubt.

### III Searches

#### A. *Dallas–Fort Worth Airport Interview and Search*

Appellant filed a motion at trial to suppress evidence collected from his luggage and his statements made to the Customs agents at the Dallas–Fort Worth Airport. The trial court denied the motion on the grounds that the Customs agents were entitled to search Irving's belongings without reasonable suspicion and, in any event, they had such suspicion. The trial court also stated that because Irving was not in custody when questioned, the Customs agents were not required to give him *Miranda* warnings. With respect to the searches of Irving's luggage and belongings, we find no error.

■ With respect to denial of the motion to suppress, we review the district court's factual findings for clear error, and review its conclusions of law *de novo. United States v. Rodriguez,* 356 F.3d 254, 257 (2d Cir.2004). We apply the same standards of review regarding the district court's determination that the defendant was not in custody for *Miranda* purposes. *Id.* at 257–58.

#### B. *Search of Irving's Belongings*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures." U.S. Const. amend. IV. With few exceptions, warrantless searches are *per se* unreasonable. *See Cady v. Dombrowski,* 413 U.S. 433, 439, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). One of those exceptions is a search at our nation's borders: "Border searches ... from before the adoption of the Fourth Amendment, have been considered 'reasonable' by the single fact that the person or item in question had entered our country from outside." *United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). An airport is considered the functional equivalent of a border and thus a search there may fit within the border search exception. *See United States v. Gaviria,* 805 F.2d 1108, 1112 (2d Cir.1986) (airport serving as final destination for nonstop international flight deemed functional equivalent of border).

■■■ Although routine border searches of a person's belongings are made reasonable by that person's decision to enter this country, more invasive searches, like strip searches, require reasonable suspicion. *United States v. Asbury,* 586 F.2d 973, 975–76 (2d Cir.1978). Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights. *See United States v. Grotke,* 702 F.2d 49, 51–52 (2d Cir.1983); *Asbury,* 586 F.2d at 975. To determine whether a nonroutine search is reasonable, the offensiveness of the intrusion must be weighed against the level of warranted suspicion. *Asbury,* 586 F.2d at 976.

Of the warrant exception contexts in which the Supreme Court has addressed the issue of pretextual searches, border searches seem most analogous to searches of vessels by Customs officials. And, in that context, the Court noted, "[w]e would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers." *United States v. Villamonte–Marquez,* 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). Similarly, in the case of searches at airports, it would make little sense to allow random searches of any incoming passenger, without reasonable suspicion, *see United States v. Montoya de Hernandez,* 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), but require reasonable suspicion for searches of passengers that are suspected of criminal activity. From this we reason that the validity of a border search does not depend on whether it is prompted by a criminal investigative motive.

■■■ As pretext should not determine the validity of a border search, it also should not determine whether a border search is routine (meaning it does not require reasonable suspicion). Rather, as we have earlier held, the level of intrusion into a person's privacy is what determines whether a border search is routine. And, we have long ruled that searches of a person's luggage or personal belongings are routine searches. *See Asbury,* 586 F.2d at 975. Accordingly, the search of Irving's luggage was valid regardless of whether Customs officials conducting the search had or did not have reasonable suspicion. Hence, we decline to decide whether reasonable suspicion for the search was present in this case.

Our holding and reasoning that Customs officials' search of Irving's luggage upon his entry into the United States was constitutional extends to the initial search of his luggage in the sterile area of the Dallas–Fort Worth Airport, and to the secondary search of his luggage in a Customs office 40 yards from the initial inspection. The border space of an airport includes "a reasonable extended geographic area in the immediate vicinity of any entry point."

*See United States v. Nieves,* 609 F.2d 642, 647 (2d Cir.1979). Secondary searches following initial Customs inspection are, like the initial inspection, valid border searches which, if routine, do not require reasonable suspicion. *See id.* at 646–47.

■ The last question we must consider in determining whether the district court erred in denying Irving's suppression motion is whether the search of the diskettes and film in his luggage was a valid search. A border search is valid under the Fourth Amendment, even if non-routine, if it is supported by reasonable suspicion. *See Asbury,* 586 F.2d at 975–76. As noted above, the question of reasonableness must be determined by balancing the level of intrusion with the level of suspicion. *See United States v. Price,* 599 F.2d 494, 499 (2d Cir.1979) ("[T]he reasonableness of a particular stop must be gauged by comparing the degree of the intrusion with the grounds for the suspicion that intrusion is called for."). A reasonable suspicion inquiry simply considers, after taking into account all the facts of a particular case, "whether the border official ha[d] a reasonable basis on which to conduct the search." *Asbury,* 586 F.2d at 976. We have pointed to a number of factors that courts may consider in making the reasonable suspicion determination, including unusual conduct of the defendant, discovery of incriminating matter during routine searches, computerized information showing propensity to commit relevant crimes, or a suspicious itinerary. *Id.* at 976–77.

Here the Customs agents found both the 3.5 inch computer diskettes and the undeveloped film *after* they collected the following information: Irving was a convicted pedophile; he was the subject of criminal investigation; he had been to Mexico; he claimed that he visited an orphanage while in Mexico; and his luggage contained children's books and drawings that appeared to be drawn by children. These all constitute specific and articulable facts, and thus may serve as the basis of reasonable suspicion. *See Price,* 599 F.2d at 500. Taking all this information into account and considering the relevant *Asbury* factors noted above, we find the Customs agents had a reasonable basis for examining the diskettes and the undeveloped film. *See Asbury,* 586 F.2d at 976. This information is certainly sufficient to justify the search of items found in Irving's luggage. Because these searches were supported by reasonable suspicion, we need not determine whether they were routine or non-routine. The district court properly denied Irving's motion to suppress with respect to the Customs officials' examination of the diskettes and film found in his luggage.

### C. Search of Irving's Brooklyn Apartment

■ . Next, Irving asserts the district court erroneously denied his motion to suppress evidence seized from a search of his home, and specifically his home computer. He contended the warrant permitting the search was based on stale information and not executed in good faith. We review *de novo* the determination that there was probable cause to issue the warrant and that, regardless, the officers executing the warrant were entitled to the good faith defense. *United States v. Smith,* 9 F.3d 1007, 1011 (2d Cir.1993).

To be valid under the Fourth Amendment a search warrant must be supported by probable cause. When making the probable cause determination, a magistrate judge must make a common sense account of all the circumstances, *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and in doing so determine whether the information in the application is current or has become stale. *See Rivera v. United States,* 928 F.2d 592, 602

(2d Cir.1991). The age of the supporting facts and the nature of the unlawful conduct is helpful in determining whether the information is stale, as is whether the supporting affidavit depicts continuing conduct or isolated and random instances of illegal conduct. *See id.; United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981). When a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that "images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes." *United States v. Lamb,* 945 F.Supp. 441, 460 (N.D.N.Y.1996) (citing cases).

As explained earlier, the affidavit in support of the search warrant for Irving's residence included information primarily collected from Decker and Irving's own writings, at least one of which was dated July 2001. *See supra* BACKGROUND, Part C. The affidavit also included Decker's statement that Irving took care to destroy pictures that were sexually suggestive or otherwise inappropriate. The defendant makes much of this final piece of information, but it only shows that Officer Coleman was forthcoming in his warrant application. The magistrate judge was entitled to weigh the evidence presented and determine, notwithstanding this statement, that there was a fair probability that child pornography would be found at Irving's apartment, and specifically on his home computer.

The nature of Irving's criminal activity and the age of the facts in the affidavit furnished evidence of continuing conduct and provided probable cause to issue the search warrant of Irving's home and computer. The affidavit furnished sufficient evidence for the magistrate judge to determine, at least preliminarily, that as a pedophile Irving would be likely to hoard pornographic images of children in his home

for extended periods of time. Moreover, in a doubtful case, we accord preference to the warrant. *See Rivera,* 928 F.2d at 602. And, even absent probable cause, the executing officers were entitled in good faith to rely on the warrant. *See United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The resulting evidence was therefore admissible at trial and the motion to suppress was properly denied.

## IV   United States Sentencing Guidelines Application

Beyond challenging his convictions, Irving also argues on appeal that his sentence should be vacated and his case remanded for resentencing because the district court based his sentence on facts not found by a jury beyond a reasonable doubt and because the district court erroneously treated the Sentencing Guidelines as mandatory. Irving also contends that the district court committed various errors in determining his Guidelines sentence. As we are vacating two of the counts of conviction, and remanding for resentencing in light of our vacating those counts, *see, e.g., United States v. Laljie,* 184 F.3d 180, 196 (2d Cir.1999); *United States v. Atehortva,* 17 F.3d 546, 552 (2d Cir.1994), we need not and do not address these arguments. The district court will conduct a *de novo* resentencing on all counts of conviction upon remand, *see United States v. Quintieri,* 306 F.3d 1217, 1228 (2d Cir.2002), and thus any *Booker*-based constitutional or statutory error in Irving's previous sentencing, *see United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), will necessarily be remedied.

## V   ERISA's Anti-alienation Provision

■ Finally, Irving asserts that we should vacate the $200,000 fine levied against him because it violated ERISA's

anti-alienation provision, *see* 29 U.S.C. § 1056(d)(1). In making this argument, Irving relies primarily on *Guidry v. Sheet Metal Workers National Pension Fund,* in which the Supreme Court refused to create an exception to ERISA's anti-alienation provision, even for "employee malfeasance or for criminal misconduct," and held that only Congress could create such an exception. 493 U.S. 365, 376, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990). As noted by the government, it appears that Congress accepted the Supreme Court's invitation in *Guidry* by enacting the Mandatory Victim Restitution Act of 1996 (MVRA). *See* 18 U.S.C. § 3613(a). The relevant provision of the MVRA states

> The United States may enforce a judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law. *Notwithstanding any other Federal law* (including section 207 of the Social Security Act), a judgment imposing a fine may be enforced against all property or rights to property of the person fined ....

*Id.* (emphasis added). District courts across the country have found 18 U.S.C. § 3613(a) permits courts to consider ERISA protected assets in determining appropriate fines and restitution. *See United States v. James,* 312 F.Supp.2d 802, 806 (E.D.Va.2004) (citing cases). We adopt this understanding of § 3613(a) because the only property exempt from that subsection is that which the government could not reach for the payment of federal income taxes. *See id.* at 805; 18 U.S.C. § 3613(a). ERISA pension plans are not exempted from payment of taxes under 26 U.S.C. § 6334, and thus they should not be exempted from payment of criminal fines. Nothing in the text of the ERISA anti-alienation provision suggests that it needs to be specifically cited to in § 3613(a) to justify our interpretation. *Compare* 42 U.S.C. § 407 (Social Security benefits anti-alienation provision), *with* 29 U.S.C. § 1056(d) (1) (ERISA anti-alienation provision). Moreover, § 3613(c) demands that criminal fines in favor of the United States should be enforced in the same manner as a tax liability would be enforced. *James,* 312 F.Supp.2d at 805–06. And, the government may look to an ERISA plan to collect unpaid taxes. *See id.;* 26 C.F.R. § 1.401(a)–13(b)(2) (2005). For the above reasons, we reject Irving's claim that the $200,000 fine levied against him violated ERISA's anti-alienation provision.

### CONCLUSION

We have considered defendant's other arguments on appeal and find them to be without merit. For the reasons stated, we vacate Irving's convictions under counts two and three, affirm his convictions under counts one, four, and five, and remand for resentencing.

JOSÉ A. CABRANES, Circuit Judge, concurring in part and dissenting in part.

I would affirm the judgment of the District Court in its entirety. I concur with the majority's reasoning in relation to counts one, four, five and ERISA's anti-alienation provision. I dissent, however, from the vacatur of the judgment of conviction with respect to counts two and three—namely, the counts concerning defendant's travel to Honduras (the "Honduras counts").

The baleful consequences of the majority's misapplication of the corroboration rule here seem clear enough. The suggestion of the majority's opinion is that when prosecuting intent-based crimes, the government will be precluded from depending on a defendant's reliable statements concerning his intent and instead must prove that intent with evidence of specific acts, such as "the testimony of hotel managers whom [the defendant] wrote objected when

they found he had brought children to his hotel room," *ante*, at 410. By requiring such *further* corroboration, the majority unnecessarily risks adding complication to the already-difficult task of prosecuting intent-based crimes. I therefore dissent from a decision that is in no way compelled by the corroboration rule.

The Honduras counts, of which defendant was convicted, charged him respectively with traveling outside the United States for the purpose of engaging in sexual acts with children under the age of eighteen, in violation of 18 U.S.C. § 2423(b), and traveling across state lines for the purpose of engaging in sexual acts with children under the age of twelve, in violation of 18 U.S.C. § 2241(c). Each of these crimes involves two elements that must be proved beyond a reasonable doubt: first, that defendant went to Honduras, and second, that he did so for the purpose of engaging in sexual acts with children under the relevant age. By the explicit terms of the statutes, the government was not required to prove that defendant engaged in particular sexual acts with children in Honduras, or indeed, in *any* specific acts in Honduras.

Our most recent pronouncement on the corroboration rule, in *United States v. Bryce*, 208 F.3d 346 (2000), emphasized that "the modern corroboration rule requires only that there be 'substantial independent evidence which would tend to establish the trustworthiness of the statement.'" *Id.* at 354 (quoting *Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 99 L.Ed. 101 (1954)). Moreover, some statements do not require corrobo-

ration—we explained that if "the defendant's statements, *given their nature and context*, can support a finding of guilt beyond a reasonable doubt, no further evidence is needed." *Id.* at 355 (emphasis added). The majority opinion concludes that defendant's journal is neither self-corroborating nor "sufficiently corroborated 'to justify a jury inference of [its] truth.'" *Ante*, at 410 (quoting *Opper*, 348 U.S. at 93, 75 S.Ct. 158).

As a matter of common sense, the journal, filled as it is with copious details about defendant's attempts to engage in sexual activity with prepubescent male street children, is a reliable guide to the purpose of his trip to Honduras. The journal—which was maintained contemporaneously, distributed to like-minded friends and filled with descriptions of behavior consistent with defendant's other known activities—demonstrates defendant's intent "so reliably that, without the need for other supporting evidence," it can support a finding of guilt. *Bryce*, 208 F.3d at 355.[1] In any event, substantial independent evidence introduced at trial—including defendant's employment records, passport, bank records, statements to his friend Decker regarding the Honduras trip, and travel to Mexico for similarly depraved purposes—makes clear that the "narrative of child molestation" contained in the journal could *not* just "as easily be a record of fantasies as of events that actually transpired," *ante*, at 409. The substantial independent evidence "supports the essential facts admitted sufficiently to justify a jury inference of their truth." *Opper*, 348 U.S. at 93, 75 S.Ct. 158.

---

1. To take but one of defendant's many comments that elucidate the purpose of his trip, his diary entry for January 2, 1999, the second day of the trip, states:
   This is the point at which in 1993 Oscar–the–Street–Boy encountered me in the street near the Hotel El Nilo and asked for something to eat, opening the way to the fulfilling week that followed that my American buddy, Zorro, and I spent with Oscar and five other uncivilized, but curiously cuddlesome Hondurans. No such luck yet this time.

It is worth underscoring that the Honduras counts do not involve charges of possession of an illicit substance, as in *Bryce*, or charges of any other *per se* illegal actions. Rather, the questions presented by the Honduras counts are whether defendant traveled to Honduras and did so for the purpose of engaging in sexual acts with children. In light of the substantial independent evidence in the record, defendant's detailed contemporary statements were certainly a reliable basis to conclude that he went to Honduras for that unlawful purpose. Accordingly, when the evidence is viewed in its totality with all inferences drawn in the government's favor, *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), a reasonable trier of fact could, as the jury did here, return a guilty verdict on the Honduras counts.