File Name: 07a0340n.06

Filed: May 15, 2007

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 06-3015

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DANIEL C. SHELDON,                     ON APPEAL FROM THE
                                            UNITED STATES DISTRICT
    Defendants-Appellants.            COURT FOR THE NORTHERN
                                            DISTRICT OF OHIO

_____/

**OPINION**

Before:        MARTIN and SUTTON, Circuit Judges; GRAHAM, District Judge.[*]

       BOYCE F. MARTIN, JR., Circuit Judge. On September 13, 2005, a jury found Daniel C. Sheldon guilty of one count of receipt and attempt to distribute, and one count of possession, of visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B). He was sentenced to 98 months' incarceration, to be followed by supervised release for life with special conditions. Sheldon now appeals his conviction on two grounds: first, that the district court abused its discretion by prohibiting defense counsel from

_____

[*]The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

conducting voir dire; and second, that the government failed to prove the visual depictions at issue were of "real" minors, as opposed to "virtual" minors, under the framework laid out in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). Finding Sheldon's arguments unavailing, we **AFFIRM**.

I

Daniel and Julie Sheldon were married in October 2003. In January 2004, they rented a house in Mentor, Ohio, where they lived with Julie's five-year-old daughter from a previous marriage. Daniel spent a large amount of time on the upstairs computer, and after some time Julie noticed that he was using it to view pornography. One day when Daniel was not home, Julie accessed his files and found that he had a computer folder dedicated to pornography, containing several dozen videos and thousands of pictures. Approximately half of the videos and pictures were of girls who appeared to be under the age of eighteen engaging in sexually explicit conduct with adults. Julie also discovered that Daniel was participating in instant-messaging "cyber sex" with young girls, or those purporting to be young girls, over the internet.

Julie pleaded with Daniel to stop what he was doing, but he declined. She then went to the Mentor Police Department and told them about his instant-messaging activities and pornography collection. Her complaint was relayed to members of the FBI-sponsored Northeastern Ohio Internet Crimes Against Children (OICAC) task force. Based on the information Julie supplied, the OICAC task force obtained a warrant to search the Sheldons' home. The search revealed multiple floppy disks, multiple CD-ROMs, and a hard drive, all containing numerous pornographic images. During the search, Daniel was advised by police that he was not under arrest, and that he was free to leave the premises or stop answering questions at any time. He nevertheless admitted to possessing

pornographic images and videos of females under the age of eighteen. He also admitted that he had obtained many of the images over the internet via Kazaa, a peer-to-peer file-sharing program.

The seized images were later examined by Richard Warner, a digital forensic examiner with the Cuyahoga County Prosecutor's Office. Warner picked out a total of 57 images, many of which were within the Kazaa shared files, which he determined were child pornography. He testified at trial that of the 57 images, he "recognized" more than one as a match to images from the known-victim database maintained by the National Center for Missing and Exploited Children (NCMEC). Warner admitted on cross-examination, however, that he did not directly check any of the 57 images against the NCMEC database; his "matching" was premised solely on recognition and recollection, based on his extensive familiarity with the database.

## II

Sheldon's first argument on appeal is that the district court violated his rights under the Sixth Amendment by prohibiting his attorney from directly conducting voir dire. As with most of its decisions made in orchestrating a trial, we review a district court's handling of the voir dire stage for abuse of discretion. *United States v. Middleton*, 246 F.3d 825, 834 (6th Cir. 2001). "We ascertain only whether the district court ensured that [the defendant] had a fair trial by a panel of impartial, indifferent jurors. Only in the absence of a fair trial is reversal warranted." *Id*. at 835-36 (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1960)) (internal quotation marks omitted).

The Sixth Amendment makes no mention of the voir dire process, let alone whether or not it must be conducted by the trial judge or the parties' attorneys. The Supreme Court has nevertheless construed voir dire to be integral to a defendant's Sixth Amendment rights:

> Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. *See Connors v. United States*, 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895). Similarly, lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts.

*Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). The above quotation says little about *who* must conduct the voir dire, however, and so we turn to the Federal Rules of Criminal Procedure, which discuss the procedure in considerably more detail.

The Federal Rules provide that a trial judge *may* examine prospective jurors himself, or in the alternative *may* permit the attorneys for the parties to conduct the examination. Fed. R. Crim. P. 24(a)(1). In the majority of federal criminal cases, as it turns out, the trial judge chooses to conduct voir dire himself. *See* 9 Moore's Federal Practice § 47.10[3][e][i] (3d ed. 2006). If he does so, the judge is required to permit the attorneys to "ask further questions *that the court considers proper*," or to "submit further questions that the court *may* ask *if* it considers them proper." Fed. R. Crim. P. 24(a)(2) (emphasis added). In other words, although a trial judge who chooses to conduct voir dire himself must at the very least solicit questions from both parties' attorneys, he is by no means *required* to ask these question unless he deems them "proper" or otherwise helpful to the voir dire process. *See, e.g., Rosales-Lopez*, 451 U.S. at 189 ("Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire."); *United States v. Aloi*, 9 F.3d 438, 441 (6th Cir. 1993) ("Federal trial judges have broad discretion in determining what questions to ask during voir dire.").

The Northern District of Ohio, the federal district in which Sheldon's trial was conducted, also provides local criminal rules that largely track the federal rule discussed above. For example, Local Criminal Rule 24.2 provides as follows:

> (a) The Court shall conduct the initial examination of all prospective jurors touching upon their qualifications to serve as jurors in the pending proceeding. The parties *may* submit written questions to be included in the Court's examination, subject to the Court's discretion.
> (b) In all trials, civil and criminal, counsel for the plaintiff and counsel for the defendant each *may* be allowed such period of time as approved by the Court to conduct voir dire examinations of prospective jurors. In cases involving more than one defendant, the time for voir dire shall be divided by counsel for the parties and additional time shall not be allowed, except that the Court in its discretion may allow additional time. Except where otherwise ordered by the Court, the jurors shall be examined collectively.

(Emphasis added.) All in all, Rule 24—whether local or federal—gives a trial judge in the Northern District of Ohio substantial latitude in presiding over the voir dire process, and yet Sheldon thinks that in his particular case, the presiding judge exceeded this latitude. We disagree. Indeed, Sheldon is unable to cite to a single case, from this circuit or any other, to convince us otherwise.

Sheldon attempts to persuade us with a child-porn-is-different rationale. He suggests that in cases such as this, "where the jury's sensibilities will be pressed to their limits" by viewing the offensive evidentiary material, only the defendant's attorney can protect a defendant's Sixth Amendment right to fair trial during voir dire, because "an attorney for the defendant accused of heinous acts needs to inquire of the venire in areas and with follow-up questions that a district court, even using the questions submitted by counsel, simply cannot know." Appellant's Br. at 23. To be sure, a jury's sensibilities may be "pressed to their limits" in a child pornography case. But they may also be so pressed in a case involving a particularly gruesome murder, or a particularly violent rape, or a particularly virulent hate crime. Yet Sheldon offers us no principled ground for

distinguishing child pornography cases from these others, at least as far as voir dire is concerned.

The fact remains that under the Federal Rules, the presiding judge in Sheldon's case acted fully within his discretion by choosing to conduct the voir dire alone and without the attorneys from either side. The judge sought input from both sides, in the form of proposed voir dire questions, as the Rules instruct him. Some of those questions he asked of the jury venire members; some of them he did not. *See United States v. Fish*, 928 F.2d 185, 186 (6th Cir. 1991) ("Judges need not use every question submitted by counsel; they need only use those to which an anticipated response would afford the basis for a challenge for cause."). Nothing was improper about this choice, nor does Sheldon even identify *which* important questions were proposed by him and yet not asked by the trial judge, or *why* the judge's failure to ask these questions—if indeed they were not asked—in any way impaired Sheldon's ability to exercise his peremptory or for-cause challenges. *Cf. Swain v. Alabama*, 380 U.S. 202, 219 (1965) ("The denial or impairment of the [peremptory challenge] right is reversible error without a showing of prejudice."). Indeed, when asked by the trial judge at the close of voir dire whether he had any objections, counsel for Sheldon replied, "Your Honor, no. There are a number of areas that we asked the Court to go into, but they have generally been covered. I have no problems." Thus, the most Sheldon can hope for at this stage is plain error review, a standard he clearly cannot meet when we find no error in the first instance. *See Johnson v. United States*, 520 U.S. 461, 466-467 ("[B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights." (brackets and internal quotation marks omitted)).

III

Sheldon's second argument on appeal is that his conviction cannot stand because the government failed to prove that the pornographic depictions he possessed were of real, as opposed to virtual, children. He styles this primarily as a sufficiency-of-the-evidence claim, but interweaves this with what he claims to be two evidentiary errors made by the trial court. The claims of evidentiary error we review for abuse of discretion. *United States v. Chambers*, 441 F.3d 438, 455 (6th Cir. 2006). As for sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *accord United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986).

Approximately one month prior to trial, Sheldon filed a motion in limine requesting that the court prohibit the government from introducing any visual depictions of minors who had not been identified as "real" minors. The district court denied the motion. Sheldon's motion relied on *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), in which the Supreme Court held portions of the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C. § 2251 *et seq.*, to be unconstitutionally overbroad in violation of the First Amendment. In *Free Speech Coalition*, the Court specifically targeted §§ 2256(8)(B) and (D) of the CPPA, which at the time prohibited "*any* visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture," that "is, *or appears to be*, of a minor engaging in sexually explicit conduct," and any sexually explicit image that is "advertised, promoted, presented, described, or distributed in such

a manner that *conveys the impression*" it depicts "a minor engaging in sexually explicit conduct." (Emphases added.)[1]

The Court found that sections 2256(8)(B) and (D) banned "a range of sexually explicit images, sometimes called 'virtual child pornography,' that appear to depict minors but were produced by means other than using real children, such as through the use of youthful-looking adults or computer-imaging technology." *Free Speech Coalition*, 535 U.S. at 241. Because virtual child pornography is not intrinsically related to the *actual* sexual abuse of children in the same way as is real child pornography, the Court reasoned, the First Amendment prohibits the former from being categorically banned. *Id*. at 250; *cf. id.* at 249 ("Where the images are themselves the product of child sexual abuse, [*New York v.*] *Ferber* [, 458 U.S. 747, 759 (1982)] recognized that the State had an interest in stamping it out without regard to any judgment about its content."). The Court also recognized the difficulty in distinguishing an image depicting a real child engaging in sexual conduct from a simulacrum thereof, but found that this did not excuse the CPPA's overbroad prohibitions:

> Experts, we are told, may have difficulty in saying whether the pictures were made by using real children or by using computer imaging. The necessary solution, the argument runs, is to prohibit both kinds of images. The argument, in essence, is that protected speech may be banned as a means to ban unprotected speech. This analysis turns the First Amendment upside down.

*Id*. at 254-55.

The trial court did not abuse its discretion in denying Sheldon's motion in limine. While the motion properly recognized the import of *Free Speech Coalition*, nothing in that case requires the

---

[1] Sections 2256(8)(B) and (D) of the CPPA have since been amended so as not to run afoul of the Supreme Court's mandate in *Free Speech Coalition*.

government to *pre*-screen, or *pre*-authenticate, child pornographic images to make sure that they are indeed real. Instead, as we held in *United States v. Farrelly*, the government is generally allowed to present the images, and then must simply put on proof that they depict real, and not virtual, children. 389 F.3d 649, 653 (6th Cir. 2004) ("[T]he Government has the burden of showing that the images in this case were of actual children. That is a fair inference from the reasoning of the Supreme Court in *Free Speech Coalition*.").[2] And as with any other evidence, the government's contention that the images are real may be properly credited or discredited by a jury. *Id*. at 653-54 ("*Free Speech Coalition* did not impose a special or heightened evidentiary burden on the Government to prove that images are of real children. The question of whether the images are virtual or real is one of fact, to be determined by evidence about which argument can be made to the jury."). No fewer than five other circuits have come to a similar conclusion, and to our knowledge not a single circuit has spoken to the contrary. *See, e.g., United States v. Rodriguez-Pacheco*, 475 F.3d 434, 441 (1st Cir. 2007); *United States v. Irving*, 452 F.3d 110, 121 (2d Cir. 2006) ("Although the Supreme Court noted the possible evidentiary difficulty of distinguishing virtual and actual child pornography, it did not establish a bright-line rule requiring that the government proffer a specific type of proof to show the use of an actual child."); *United States v. Slanina*, 359 F.3d 356, 357 (5th Cir. 2004) (per curiam) ("[T]he Government was not required to present any additional evidence or expert testimony to meet its burden of proof to show that the images downloaded by [defendant] depicted real children, and not virtual children. The district court, as the trier of fact in this case, was capable of reviewing the evidence to determine whether

---

[2]We note that our decision in *Farrelly* was abrogated on other grounds by *United States v. Williams*, 411 F.3d 675, 678 n.1 (6th Cir. 2005). This has no impact on *Farrelly*'s application to the instant case, however.

the Government met its burden to show that the images depicted real children."); *United States v. Kimler*, 335 F.3d 1132, 1142 (10th Cir. 2003) ("Juries are still capable of distinguishing between real and virtual images; and admissibility remains within the province of the sound discretion of the trial judge."); *United States v. Deaton*, 328 F.3d 454, 455 (8th Cir. 2003) (per curiam); *but see Rodriguez-Pacheco*, 475 F.3d at 464 (Torruella, J., dissenting) ("It is now beyond scientific dispute that it is possible to create virtual photographic images that can only be detected (with difficulty) by experts. Thus, experts are required before factfinders can make their findings on this issue.").

Sheldon's related claim, that one of his proposed witnesses was improperly excluded and that as a result the jury was presented with insufficient evidence to sustain his conviction, fails for similar reasons. After Sheldon himself testified at trial, his counsel sought to introduce testimony from Dean Boland, a purported "expert in the area of cyber forensics." Trial Tr. at 466. Sheldon's counsel sought to use Boland's testimony to counter that of Richard Warner, the government's digital forensic examiner who had linked some of the images possessed by Sheldon to the NCMEC database. However, it was not until the eleventh hour that counsel informed the judge and the prosecution that he intended to have Boland testify. The prosecution objected, and the trial judge sustained the objection, thus excluding Boland. *Id*. at 469 ("Basically you had an obligation to disclose expert witnesses you would call, and . . . you had an obligation to give a report by him, so I'll sustain the objection.").

We find this to have been an entirely reasonable exercise of the trial judge's discretion. Sheldon's counsel indicated that he wanted Boland to testify as to the "realness issue" — that is, "how you cannot tell from an image the age" of the person depicted, and presumably also how you cannot tell from an image whether it depicts a real or a virtual person. *Id*. at 466. Yet this issue was

the crux of Sheldon's defense (as well as the crux of his current appeal), and thus it is inexplicable why Boland was not proposed as a witness in timely fashion. Certainly Sheldon's counsel did not provide good cause for introducing Boland at such a late stage in the trial proceedings.[3]

The jury was thus left with a series of images and videos containing persons engaging in sexually explicit conduct, and they had to determine whether these persons were "minors" within the meaning of 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B). The jury was also presented with the testimony of Julie Sheldon, who gave her lay opinion as to the age of the people her husband was chatting with and viewing over the internet, and the testimony of Richard Warner, who opined that several of the images seized from Sheldon's computer matched those he was familiar with in the NCMEC database. Sheldon maintains that this evidence was insufficient to maintain his conviction. We disagree. As we clearly stated in *Farrelly* on strikingly similar facts to those here:

> [N]o contrary evidence was offered to suggest either that any of the visual depictions were computer generated, or that they were not produced using actual minors. Having not only heard the [government's expert] testimony, but also having viewed the images in question, the jury was in a position to draw its own conclusions about whether they depicted actual children. . . . Juries are still capable of distinguishing between real and virtual images; and admissibility remains within the province of the sound discretion of the trial judge.

389 F.3d at 653-55. In this case, as in *Farrelly*, we cannot conclude that *no* rational juror could have found that the images possessed by Sheldon were of real children and not virtual children. We therefore reject his sufficiency-of-the-evidence claim.

---

[3]Furthermore, it is not entirely clear to us how Boland's testimony, which likely would have been generalized testimony about how difficult it is to differentiate between real and virtual images of children, would have been effective in countering Warner's testimony regarding the NCMEC. Sheldon's defense counsel actually seems to have done an excellent job of undermining Warner's testimony by forcing him to admit on cross-examination that he had not conducted a thorough matching analysis between Sheldon's seized files and the NCMEC database, but relied instead on the fact that he simply "recognized" the images as similar.

At the very end of his brief, Sheldon is wise enough to realize that *Farrelly* stands as a massive roadblock to his claims. Appellant's Br. at 35 ("The crux of the problem is . . . the holding in *Farrelly*."). And since he cannot distinguish his own case from *Farrelly*, he therefore urges us to reverse it, arguing that it places a jury in the "untenable position of deciding whether depictions of minors in child pornography are real or virtual." *Id*. at 2; *see also id*. at 35-36. For starters, we do not find that *Farrelly* was wrongly decided, at least not with respect to its holding that "*Free Speech Coalition* does not require the Government to do more in the context of [a child pornography] case than present the images to the jury for a determination that the depictions were of actual children." 389 F.3d at 652; *see also Free Speech Coalition*, 535 U.S. at 254 ("The hypothesis [that real and virtual images are utterly indistinguishable] is somewhat implausible. If virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice.").

And even if we were to take issue with the holding in *Farrelly*, a three-judge panel such as this one would be powerless to reverse it, especially because *Farrelly* postdates *Free Speech Coalition* and squarely addresses its implications. "A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Dingle v. Bioport Corp.*, 388 F.3d 209, 215 (6th Cir. 2004) (quoting *Salmi v. Sec'y of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir.1985)).

IV

For all of the reasons discussed above, we **AFFIRM** Sheldon's conviction.