**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**JAHLIL J. WARD, Defendant**

Criminal No. F264/2008
Superior Court of the Virgin Islands
Division of St. Thomas and St. John
July 23, 2010

346

CLAUDE E. WALKER, ESQ., COURTNEY A. REESE, ESQ., Assistant Attorneys General, Virgin Islands Department of Justice, St. Thomas, USVI, *Attorneys for the Plaintiff.*

MICHAEL C. QUINN, ESQ., ASHLEE GRAY, ESQ., Dudley Topper & Feuerzeig, LLP, St. Thomas, USVI, *Attorneys for the Defendant.*

HOLLAR, *Judge*

## MEMORANDUM OPINION

(July 23, 2010)

## I. INTRODUCTION

Before this Court is Defendant Jahlil J. Ward's Motion for New Trial, filed January 7, 2010. An opposition was filed by the People on January 19, 2010, requesting the Court to deny the Defendant's request for a new trial. Defendant's Supplemental Motion was filed on February 17, 2010.

## II. FACTS AND PROCEDURAL BACKGROUND

On October 6, 2008, this matter along with *People of the Virgin Islands v. Anselmo Boston*, ST-07-CR-307 and *People of the Virgin Islands v. Kamal Thomas*, ST-07-CR-298 came on for a consolidated jury trial. After a four (4) day trial, the jury reached a verdict on October 10, 2008. Defendant Ward was found guilty of first degree murder, third degree assault and using a dangerous weapon during a third degree assault. Defendants Boston and Thomas were each found guilty of third degree assault, and using a dangerous weapon during a crime of violence, to wit: third degree assault and simple assault. Following the announcement of the verdict, the jury was polled. Immediately following, the polling of the jury and their discharge, counsels for Defendant Ward requested reconsideration of their Rule 29 motion, which was earlier denied. The Court ordered Defendant Ward to submit a memorandum supporting his motion by October 24, 2008 and the People to response by November 7, 2008. Sentencing was scheduled for Friday, November 14, 2008 and Defendant Ward was remanded to the Bureau of Corrections pending sentencing.

On October 24, 2008, Defendant Ward filed a Motion for Judgment of Acquittal and New Trial. In support of his motions, defense counsel argued that the People failed to show evidence of premeditation for first degree murder. Counsel also argued that because the jury's verdict was against the weight of evidence and that several rulings by the Court

during the trial were erroneous, a new trial should be granted.[1] An opposition was later filed by the People on November 13, 2008.

At sentencing on Friday, November 14, 2008, the Court admonished counsel for filings untimely post-trial motions, but nonetheless oral arguments were heard on all outstanding motions, including Defendant's Motion for Reconsideration of the Rule 29 Ruling. After oral arguments, the Court reserved ruling and ordered the parties to file no later than December 5, 2008[2] supplemental briefs on issues raised at the hearing. Sentencing was then postponed. On December 5, 2008, counsel for Defendant Ward and the People filed supplemental motions.[3]

Before the Court made its final ruling on Defendant Ward's Rule 29 Motion, Defendant Ward filed two additional motions requesting a new trial. On January 12, 2009 Defendant Ward filed a Motion for New Trial on the grounds of newly discovered evidence. Specifically, Donald Lee, a newly discovered witness, reportedly said that Defendant Kamal Thomas confessed to him that he killed a white guy, James Patrick Cockayne, in St. John. Having received no response, Defendant Ward filed a Motion to Deem Conceded his Motion for New Trial on March 16, 2009. The People thereafter on March 24, 2009 filed a motion explaining that its response to Defendant Ward's New Trial Motion was filed on December 5, 2008. Counsel further argued that Defendant Ward's New Trial Motion was without any merit and based solely on Donald Lee's unsworn statement.

On April 16, 2009, Defendant Ward filed yet another Motion for New Trial but based on a *Brady v. Maryland*.[4] Under *Brady*, Defendant Ward alleges that four (4) months after the trial and his conviction, in a

---

[1] In his motion filed October 24, 2008, Defendant Ward argues that a new trial should be awarded since the jury's verdict was against the weight of evidence. Specifically, Defendant argues that the testimony of four (4) of the government's witnesses, Aaron Ferguson, Abigail Schnell-O'Connell, Glanville Frazer, and Jo'Nique Clendinen, gave testimony that were inconsistent regarding the description of the assailant.

[2] At the November 14, 2008 hearing, the Court reserved its ruling to allow the parties to supplement their briefs on whether there was sufficient evidence at trial to support the charge of first degree murder. Specifically, counsel for Defendant Ward argued that the evidence adduced at trial did not show premeditation, which is required for a conviction of first degree murder.

[3] *See* Defendant Ward's Supplemental Brief, filed December 5, 2008 and the People's Supplemental Brief in Support of Motion for Reconsideration of Reduction of Third Degree Assault Charges and Upholding the Jury Verdict for the Defendants, filed December 5, 2008.

[4] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

correspondence,[5] counsel for the People disclosed for the first time that she inadvertently failed to turn over the statement of Daryl Martens that implicated Defendant Kamal Thomas as the murderer of James Patrick Cockayne.

At a hearing on April 17, 2009, the Court heard oral arguments on Defendant's Motion for a New Trial dated January 12, 2009. After sworn testimony from several witnesses, the Court denied Defendant Ward's Motion on the basis of newly discovered evidence. The Court found that newly discovered evidence offered by Defendant Ward failed to support that Defendant Kamal Thomas was at the location alleged by Donald Lee, and thus Donald Lee's credibility was impeached. With respect to Defendant's Motion for New Trial filed on April 16, 2009, the Court heard no oral arguments from the parties and made no rulings given the recent filing of the motion. The Court instead ordered counsel for the People to submit a response by May 4, 2009 and Defendant Ward to reply by May 11, 2009.

On May 4, 2009, the People filed an opposition to Defendant's New Trial Motion based on a *Brady v. Maryland* violation. In its opposition, the People argued that the nondisclosure of Daryl Martens' statement should not disturb the jury verdict. According to the People's response, Martens' statement was fully available to the defense counsel under the department's "open file" policy and counsel for Defendant Ward had an opportunity to utilize similar evidence at trial, but chose not to do so. The People further explained that Daryl Martens' statement was not material and thus would not have made a difference at trial. Shortly thereafter, Defendant Ward filed a reply motion on May 8, 2009.

On May 27, 2009, the Court issued an Order requiring the People to answer inquiries regarding the discovery of Daryl Martens' undisclosed statement and the events leading up to Defendant Ward's arrest. Responses to the Court ordered inquiries were filed by the People on June 19, 2009 and Defendant Ward on June 19, 2009 and June 22, 2009 respectively.

After reviewing the parties' filings and hearing oral arguments on July 27, 2009, the Court granted Defendant Ward's motion for a new trial on

---

[5] *See* Letter from Assistant Attorney General Renee Gumbs-Carty to Michael A. Quinn, Esq., filed April 15, 2009.

August 5, 2009. In a published Memorandum Opinion and Order, filed on August 5, 2009, the Court found the failure by the People to turn over the statement of Daryl Martens to Defendant Ward's counsel, whether intentional or not, was material evidence and a violation of *Brady v. Maryland*, hence a new trial was warranted.[6]

Next, on August 7, 2009, the People filed an informative motion, containing additional discovery information about Daryl Martens. According to the People's motion, Daryl Martens received payments from the Cockayne family *prior to the first trial* as "expense money" and these payments were made without the prosecution team's knowledge.

Upon further investigation, the People discovered that two additional witnesses, Kenneth Rawlins and Aaron Ferguson received payments from the Cockayne family, as a reward for their testimony after the first trial but Aaron Ferguson was also reportedly given a substantial sum before the first trial to retain an attorney and "to purchase clothes" to wear to Court.[7] These payments were made without the knowledge of the prosecutors.

Given these events, on August 21, 2009, the People filed a motion requesting an evidentiary hearing be held by the Court.[8] Specifically, the People requested that Jeanie Cockayne, William Cockayne, Daryl Martens, Kenneth Rawlins, Aaron Ferguson, and Attorney David Cattie give sworn testimony regarding all compensation paid in connection with this matter. At a hearing on September 4, 2009, the Court heard oral arguments on all outstanding motions including the People' motion for an evidentiary hearing.

After reviewing the discovery information filed by the People, and responses to inquiries previously made,[9] this Court issued an Order on

---

[6] In the Court's Memorandum Opinion and Order dated, August 5, 2009, the Court denies all other grounds for new trial and/or acquittal raised by Defendant Ward.

[7] The Cockayne family paid Kenneth Rawlins and Aaron Ferguson $5,000.00 each as a reward for their testimony after the first trial. *See* People's Motion for an Evidentiary Hearing, filed on August 21, 2009. Even Aaron Ferguson's father made a payment request for his son to "retain" an attorney and for $750.00 for him to buy a suit to wear to Court when he testified, which the Cockayne family later provided. *See* Jim Ferguson's email dated October 25, 2008 attached in the People's Demand for Notice of Alibi Supplemental Discovery and Reciprocal Demand filed September 3, 2009.

[8] *See* People's Motion for an Evidentiary Hearing, filed on August 21, 2009.

[9] On September 1, 2009, the Court issued an Order requiring the parties to be prepared to answer certain inquiries at the September 4, 2009 hearing.

September 10, 2009. In the Order, the Court made the following rulings: (1) Defendants Anselmo Boston and Kamal Thomas were granted a new trial based on newly discovered evidence[10] and (2) Defendants Anselmo Boston and Kamal Thomas new trials would be consolidated with this matter. Additionally, the Court inquired whether the People would grant immunity to the "paid" government witnesses. In response to the Court's Order, the People filed an informational motion on September 10, 2009. In its motion, the People explained that Justice Department would not grant immunity *at this time* nor would it prosecute the following individuals involved in the payments: William Cockayne, Jeanie Cockayne, Kenneth Rawlins, and Aaron Ferguson. With respect to Daryl Martens, however, the Justice Department took a different position. While the People's motion indicated that Daryl Martens would not be granted immunity, the People remained conspicuously silent as to whether Daryl Martens would be prosecuted for accepting a payment from the Cockaynes if he appeared within the U.S. Virgin Islands to testify.

Having granted a new trial to all three (3) Defendants, the issue surfaced as to whether the trials should remain consolidated. The Court issued Orders on October 20, 2009 and November 12, 2009, requiring the parties to answer inquiries regarding the impact of: (1) the admission of Defendant Kamal Thomas' unredacted statement to Detective Mario Stout in a consolidated case; (2) the availability of Defendant Kamal Thomas as a defense witness if the cases are severed; and (3) the availability of Daryl Martens' statement if he refused to return to the territory or if he invoked his Fifth Amendment Rights.

After reviewing the parties' responses,[11] and hearing oral arguments on November 23, 2009, the Court severed Defendant Ward's case to allow counsel for Defendant Ward the opportunity to utilize *Brady* material, which was unknown to counsel at the first trial, and to possibly utilize evidence that would be otherwise inadmissible if the cases were consolidated. Specifically, Defendant Ward would be allowed to introduce exculpatory evidence of Defendant Kamal Thomas' statement to Mario

---

[10] The Court granted Defendants Boston's and Thomas' motion for new trial based on newly discovered evidence that the Cockayne family paid certain government witnesses to testify at the trial.

[11] *See* People's Responses to Inquiries of Court Order dated October 20, 2009, and October 27, 2009. *Also see* Defendant Ward's Informative Motion filed November 4, 2009.

Stout, Defendant Boston's statement to Delbert Phipps, and Defendant Kamal Thomas' new charges of witness tampering/intimidation.[12] *See* FED. R. EVID. 804(a)(2) and (5); FED. R. EVID. 804(b)(3).

At a final pre-trial hearing on December 9, 2009, the Court made the following rulings: (1) Daryl Martens' statement may be admitted through the testimony of Assistant Attorney General Renee Gumbs-Carty;[13] (2) counsel for Defendant Ward may inquire into payments made by the Cockayne family to government witnesses; (3) Clayton Boyce may testify to rebut Daryl Martens' statement; and (4) Defendant Kamal Thomas would be deemed "unavailable" so his statement against his interest could be introduced through the testimony of Detective Mario Stout; and (5) Defendant Anselmo Boston would likewise be deemed unavailable so his statement against his interest could also be introduced through the testimony of Delbert Phipps.[14]

On Monday, December 14, 2009, this matter came on for jury trial. On Tuesday, December 15, 2009, the People rested. Counsel for Defendant Ward made an oral motion for judgment of acquittal on Counts I and II pursuant to FED. R. CRIM. P. 29, which the Court later denied. The Court then heard sworn testimony of several defense witnesses after which an overnight recess was declared. The next day, Wednesday December 16, 2009, the Court, jury, and respective parties sojourned to the island of St. John to view the crime scene and other locations mentioned during the testimony of witnesses during the Defense's case-in-chief. After

---

[12] On August 15, 2007, Defendant Kamal Thomas was charged with threatening a witness in connection with this matter. *See People v. Kamal Thomas*, Case No. ST-07-CR-299, 2010 V.I. LEXIS 51 (2010).

[13] Since Daryl Martens could not be located for service for the second trial, the Court declared that he was an unavailable witness. The Court noted that the People's stance on Martens' immunity and possible prosecution may have deterred him from appearing to testify in this matter. Nonetheless, the Court allowed Martens' interviewed statement to be introduced through Assistant Attorney General Renee Gumbs-Carty, since she took notes of his statements during their meeting and it satisfied. *See* FED. R. EVID. 804(a)(5).

[14] At the time of this hearing, the Court was informed by counsels for Defendant Thomas and Defendant Boston that they would not be testifying in this matter. Both Defendants at that time were still awaiting a new trial for third degree assault, and could not be compelled to testify because to do so would be a Fifth Amendment violation. *See* FED. R. EVID. 804(a)(1), (5), and 804(b)(3). Furthermore, Defendants Thomas' and Boston's statements against their interest constituted an exculpatory *"Brady"* material for Defendant Ward.

additional witnesses testified, counsel for Defendant Ward rested. The People presented one witness in rebuttal and then rested.

On Thursday, December 17, 2009, the parties made their closing arguments and the jury was given final instructions. The jury then retired to deliberate. During deliberations, the Court received a note from the jury foreperson, which stated that the jury could not reach a verdict. After reading the note to the parties, the Court declared an overnight recess and the jury panel were excused.

On Friday, December 18, 2009, the jury was told to resume deliberations.[15] The Court received a second note from the jury. Note #2 stated:

### Do we address every Count and sign either a not guilty or guilty paper?

Following a discussion with the parties, the Court brought the jurors out in open court and explained the verdict forms to them and how the forms were to be utilized. The jury returned to the deliberation room. Shortly thereafter, the jury informed the Court that it had reached a verdict. Defendant Ward was found "Not Guilty" for Count I, first degree murder, but "Guilty" on Count II, second degree murder, "Guilty" on Count III, assault with a deadly weapon, and "Guilty" on Count IV, unlawful use of a dangerous weapon during the commission of a third degree assault. Following the verdict, the jury was polled and each juror affirmed the verdict was their independent decision. The Court thanked and excused the panel. Sentencing was then scheduled for Friday, January 22, 2010. The Court ordered that a pre-sentence report be prepared or that any existing report be updated. Defendant Ward was then remanded to the Bureau of Corrections until sentencing.

On January 5, 2010, Defendant Jahlil J. Ward filed a Motion for New Trial. Specifically, Defendant Ward's motion argued that a new trial should be granted because: (1) the Court erred in admitting the unredacted statements of Defendant Anselmo Boston and Defendant Kamal Thomas into evidence; (2) the Court erred in excluding a statement of Glanville

---

[15] The jury was given an instruction that was endorsed by the Third Circuit Court of Appeals in *United States v. Fioravanti*, 412 F.2d 407, 420 (3d Cir. 1969). An *"Allen"* charge was totally avoided. (*See Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896)).

Frazer to Sergeant Roslyn Bedminster into evidence; (3) the jury's verdict is against the weight of the evidence and a miscarriage of justice will result if the verdict is permitted to stand; and (4) a fair trial was not given to Defendant Ward due to the prosecutorial misconduct by the People.

In an opposition filed on January 19, 2010, the People explained that any errors made by the Court during trial regarding the admissions or exclusion of evidence, were harmless errors and not enough to warrant a new trial. Furthermore, the jury's verdict should not be disturbed since the jury heard all the evidence. According to the People's response, the Court cured and ameliorated any *Brady* violation by granting the second (new) trial and allowing the prosecutor from the first trial to testify and be examined by the defense counsel, thus getting in Daryl Martens' statement implicating Kamal Thomas as the murderer of James Cockayne.

On February 17, 2010, a supplemental motion was filed by the Defendant Ward to further support his new trial motion pursuant to SUPER. CT. R. 135.

## III. STANDARD OF REVIEW FOR MOTION FOR NEW TRIAL

■■ A motion for new trial is governed by SUPER. CT. R. 135[16] and FED. R. CRIM. P. 33.[17] The decision to grant or deny a motion for new trial is within the sound discretion of the court. *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006). In making this determination, the Court may independently weigh the evidence and credibility of each witness. *Government v. Davis*, 35 V.I. 72, 85 (Terr. Ct. 1997) (citing *Government v. Grant*, 19 V.I. 440 (Terr. Ct. 1983)). Some courts weigh evidence as if it

---

[16] Superior Court Rule 135 provides:

The court may grant a new trial to a defendant if required in the interest of justice. The court may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A new trial based on the grounds of new discovered evidence may be made only before, or within two years after, final judgment. A motion for a new trial based on other grounds shall be made within 10 days after finding of guilty, or within such further time as the court may fix during the 10-day period. In no event shall this rule be construed to limit the right of a defendant to apply to the court for new trial on the grounds of fraud or lack of jurisdiction.

[17] FED. R. CRIM. P. 33(a) provides:

Upon the defendant's motion, the court may vacate any judgment and grant a new trial, if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

were sitting as a "thirteen juror" while other courts have rejected this notion reasoning that "a trial court may not simply reject a jury's verdict merely because the judge . . . reached a different verdict." *Stevens v. People*, 52 V.I. 294, 306 (2009). *See Government of the Virgin Islands v. Davis*, 35 V.I. 72, 85 (Terr. Ct. 1997); *Government of the Virgin Islands v. Commissiong*, 706 F. Supp. 1172, 1184 (D.V.I. 1989). Given this split, the "thirteenth juror" standard is not absolute and a trial court will not have abused its discretion by declining to apply that standard. *See Stevens*, 52 V.I. at 306. With or without the "thirteenth juror" standard, a new trial should be granted only if the Court determines that: (1) the jury's verdict is contrary to the weight of the evidence; *and* (2) there is a serious danger that a miscarriage of justice has occurred. *Stevens*, 52 V.I. at 306. Furthermore, if the trial court finds that the evidence preponderates heavily against the verdict, which only occurs in extraordinary circumstances, the court may order a new trial. *Davis*, 35 V.I. at 85.

## IV. ANALYSIS

The issues to be resolved by the Court are: (1) whether the Court should invoke its supervisory power to dismiss the Information against Defendant Ward as a result of prosecutorial misconduct; (2) whether the jury's verdict is against the weight of the evidence; and (3) whether a serious miscarriage of justice will occur if the Defendant's conviction stands.[18]

### A. The Court Should Not Invoke Its Supervisory Power To Dismiss the Information As A Result Of Prosecutorial Misconduct.

In his motion, Defendant Ward argues that the failure of the People to produce Daryl Martens' exculpatory statement to Defendant Ward coupled with the V.I. Department of Justice's indecisiveness as to whether

---

[18] Defendant Ward raised two (2) additional issues in his Motion for New Trial dated January 5, 2010. Those issues were: (1) whether the Court erred in admitting the unredacted statements of Anselmo Boston and Kamal Thomas into evidence; (2) whether the Court erred in excluding a statement of Glanville Frazer to Sergeant Roslyn Bedminster into evidence. With respect to the first issue, the Court held that the unredacted statements of Anselmo Boston and Kamal Thomas were introduced by virtue of the doctrine of "completeness." In review of the second issue, the Court held that the statement was properly excluded because to do otherwise would admit "double hearsay."

it would prosecute Martens, allegedly for taking money in exchange for testimony before a trial, if he returned to the territory to testify on behalf of the Defendant Ward, demonstrates a deliberate pattern by the prosecutors to impede Defendant Ward's opportunity for a fair trial under the Sixth Amendment as it applied in the Virgin Islands through Section 3 of the Revised Organic Act of 1954, as amended. According to counsel for Defendant Ward, the People's position regarding Daryl Martens is even more egregious since the People in contrast made the "arbitrary and capricious" decision that they *would not* prosecute William and Jean Cockayne, the parents of the deceased, for offering money to witnesses. This disparity in treatment between equal wrongdoers can only be construed as the People's unbridled determination to once again block Defendant Ward from utilizing possible exculpatory evidence at trial.

Counsel for Defendant Ward, dissatisfied with the verdict after the second trial, even complains that the Court's prior remedy of granting a new (second) trial and its admission of Daryl Martens' statement regarding Defendant Kamal Thomas' admission(s) to killing James Cockayne did not cure the prejudicial harm to Defendant Ward because the People's prosecutorial misconduct continued beyond the first trial. In sum, counsel for Defendant Ward maintains that if the jury were given an opportunity to hear Daryl Martens' live testimony at the first trial or the retrial of this matter, a different and/or more favorable verdict may have resulted.

 In light of the legal standard applicable to this issue, the Court is not persuaded that Defendant Ward's Sixth Amendment opportunity for a fair trial was violated. Under the Sixth Amendment of the Constitution, a criminal defendant has the right to offer testimony of favorable witnesses and "to have a compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI.[19] Even though this right is guaranteed, a criminal defendant must show more than the mere absence of a witness' testimony to establish a violation. *See United States v. Valenzuela-Bernal*, 459 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). To establish a violation of the Sixth Amendment's Compulsory Process, a criminal defendant must show:

---

[19] The Sixth Amendment Compulsory Process Clause applies to the U.S. Virgin Islands through Section 3 of the Revised Organic Act of 1954, as amended.

First, that [the Defendant] was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony *would have been material* and favorable to his defense; and third that the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose.

*Government of the Virgin Islands v. Mills*, 956 F.2d 443, 446 (3d Cir. 1992).

■ The U.S. Supreme Court refined this test in *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) when the Court explained that evidence is only material "if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of facts." *Id.* at 682. Moreover, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

In *Valenzuela-Bernal, supra*, the Court held that a mere showing that "undocumented immigrant" witnesses were deported by the Government is not sufficient to establish that the defendant's rights to a compulsory process were violated. *Id.* at 872-874. "A criminal defendant must [make] a plausible showing that the testimony . . . would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Id.* at 873.

In this case, counsel for Defendant Ward argues that the defense was denied access to Daryl Martens' "live" testimony due the People's heavy-handed tactics. *See* Defendant Ward's Motion for a New Trial, filed January 5, 2010. Specifically, the thrust of defense counsel's argument is that the People's withholding of Daryl Martens' exculpatory statement in the first trial coupled by its intent or threat to possibly prosecute Martens if he returned to the Territory to testify[20] in the second trial reasonably ensured that a critical defense witness' testimony would not be heard at the second trial. *Id.* at 12-13. (*See also* Defendant Ward's Supplementary Motion for a New Trial, filed February 17, 2010 at p. 10). According to counsel for Defendant Ward, "although the Court made every effort to find an appropriate alternative, none adequately replaced Martens' live testimony." *Id.* at 12. Moreover, with Martens' physical absence from the second trial, the jury was prevented from adequately assessing his

---

[20] Upon all indications, Daryl Martens left the jurisdiction and was residing in California. The Superior Court's subpoena power does not extend outside the Territory of the U.S. Virgin Islands.

demeanor and credibility, and the defense was denied an opportunity to refute any evidence presented by the People to impeach Daryl Martens' testimony or statement.

■ Although the V.I. Department of Justice's threat to possibly prosecute Martens if he returned to the Territory may have been a contributing factor for Martens' refusal to return,[21] the Court concludes that counsel for Defendant Ward was given sufficient tools to cure any harmful effects caused by the People's misconduct and Daryl Martens' absence. Therefore, the Court is not persuaded that Daryl Martens' live testimony could have reasonably affected the jury's ultimate verdict.

In ameliorating the "high handed" position taken by the prosecution regarding Daryl Martens appearance at trial, the Court fashioned several remedies to allow counsel for Defendant Ward an opportunity to utilize *Brady* material while ensuring that Defendant Ward a fair trial. These remedies included the following:

- Severance of the Defendants Kamal Thomas' and Anselmo Boston's trial from Defendant Ward's trial;

- Admissions of Defendant Kamal Thomas' unredacted statement to Officer Mario Stout taken on July 10, 2007;

- Admission of Defendant Anselmo Boston's unredacted statements to Officer Delbert Phipps taken on July 10, 2007;

- Exculpatory statements made by Daryl Martens to the former case prosecutor could be introduced through that prosecutor;

- Admission of evidence (if offered) regarding Defendant Kamal Thomas' charges of witness tampering.

Applying FED. R. EVID. 804(a)(5),[22] the Defendant Ward received the best of two (2) worlds, to wit: admissions of the confession purportedly

---

[21] It was established that counsel for the Defendant left numerous telephone messages for Daryl Martens at his last known telephone numbers; however, those calls were never returned.

[22] FED. R. EVID. 804(a) – Hearsay exceptions; declarant unavailable

(a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant – (5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means.

told to or heard by Daryl Martens, whereby Kamal Thomas admitted to killing James Cockayne, without Daryl Martens being subject to possible impeachment for accepting money from the Cockaynes before trial. Defendant Ward was also able to sidestep certain disclosures reportedly made by Daryl Martens to a FBI agent which contained some very disrespectful racial remarks regarding the Caribbean locals.

Additionally, counsel for Defendant Ward had the opportunity during the second trial to tie in the fact that the People had a warrant issued against Defendants Anselmo Boston and Kamal Thomas a year before Defendant Ward was arrested and the affidavit for the warrant was obviously supported by the testimonies made by Aaron Ferguson and Abigail Schnell-O'Connell. Counsel for Defendant Ward was free to emphasize the fact that the Defendant Ward remained in constant contact with the V.I. Justice Department when he was not required to do so since he left the Territory a year before, at the Government of the Virgin Islands'[23] expense, as part of the witness protection program. Counsel for Defendant Ward could have also disclosed that Defendant Ward returned to the Virgin Islands, not as a result of a warrant or extradition, but instead as a result of Defendant Ward asking the Government for a return airline ticket home to attend the 2008 Carnival festivities on St. John. Defendant Ward made this request even before the outcome of Defendants Anselmo Boston's and Kamal Thomas' prosecution. These actions by Defendant Ward and the Government are totally inconsistent with that of a guilty person.

The Court even gave a "green light" to counsel for Defendant Ward to present testimony and evidence concerning the pay-off transactions between the Cockayne family and certain government witnesses, however counsel for Defendant Ward chose not to use that evidence which included: (1) photocopies of payment checks to Kenneth Rawlins and Aaron Ferguson from the Cockaynes for their testimony, which payment was unbeknownst to the prosecution; (2) e-mail correspondences between employees of the Justice Department and the Cockayne family regarding which witnesses were to be paid; (3) the frequency of pay-off transactions, and the need to "keep it (pay-offs) on the down low," to avoid the public perception of buying witness testimony; and (4)

---

[23] The phrases "Government of the Virgin Islands" and "People of the Virgin Islands" are interchangeable.

testimony from any person involved in the witness payoff transactions, including the V.I. Justice Department employees Dr. Iris Kerns and Ms. Sara Lezama, who apparently assisted the Cockayne family in locating witnesses for the payoff without the knowledge of the prosecution. *See* People's Demand for Notice of Alibi Supplemental Discovery and Reciprocal Demand, filed September 1, 2009 and September 3, 2009.

Even though these and other defense weaponry were made available by the Court for defense counsel's use on a "silver platter," counsel for Defendant Ward obviously utilizing "trial strategy," chose to "cherry pick," taking and using some of the weaponry while leaving others on the table. Accordingly, defense counsel must be estopped from crying foul play and prosecutorial misconduct after the jury verdict returned a guilty verdict.

### B. The Weight of the Evidence is Against the Jury's Verdict.

In his motion, Defendant Ward argues that in the interest of justice his conviction should be vacated and a new trial should be ordered. According to Defendant Ward, the evidence adduced at trial does not support his conviction for Count II, second degree murder, Count III, assault with a deadly weapon, and Count IV, unlawful use of a dangerous weapon during the commission of a third degree assault.

■ A trial court may vacate a judgment if it is necessary to do so in the interest of justice. Superior Court Rule 135 provides:

> The court may grant a new trial to a defendant *if required in the interest of justice*. The court may vacate the judgment if entered, take additional testimony, and direct the entry of a new judgment.

■ In *Stevens supra*, 52 V.I. 294, the Supreme Court of the Virgin Islands established a two-prong test for determining whether a new trial is necessary in the interest of justice. Under this test, a trial court must first determine whether the weight of the evidence is contrary to the jury's verdict. Then, the Court must decide if a serious danger that a miscarriage of justice will occur if the Defendant's conviction stands. The holding in *Stevens, sub judice,* further held that in ruling on a motion for a new trial, a judge's role is an active one requiring the exercise of the court's *own independent judgment*. Specifically:

> [T]he Superior Court plays a much more active role in considering a motion for new trial based on the arguments that the jury's verdict is against the weight of evidence. Here, the Superior Court exercises it own judgment in accessing the Government's case. *However, even if the Superior Court believes that the jury verdict is contrary to the weight of the evidence*, it can order a new trial *only* if it believes that there is a serious danger that a *miscarriage of justice has occurred* — that is, an innocent person has been convicted.

*Id.* at 305-306.

In our case, counsel for Defendant Ward argues that testimony from four (4) of the prosecution's witnesses were contradictory and irreconcilable regarding the identity and flight direction of the assailant. Counsel for Defendant Ward further contends that the Court must engage in an independent review of the record, weigh evidence and make an independent assessment of the credibility of: Glanville Frazer, Abigail Schnell-O'Connell, Aaron Ferguson, and Jo'Nique Clendinen. *See* Defendant Ward's Supplementary Motion for New Trial Pursuant to SUPER. CT. R. 135, filed February 17, 2010.

Under the first prong of the *Stevens* test, the Court having exercised the assessment required concludes that the evidence presented by the People regarding the identification and flight direction of a "single" assailant was irreconcilably conflicting. According to the testimony of Glanville Frazer and Jo'Nique Clendinen, Defendant Ward appeared at Frazer's apartment approximately midnight on June 17, 2007. However, Abigail Schnell-O'Connell, and Aaron Ferguson testified independently that at approximately the same time that Glanville Frazer and Jo'Nique Clendinen testified as to Defendant Ward coming to their home, they observed an assailant run down the street, from where James Cockayne stumbled from behind a partition, *to a waiting car and immediately fled the crime scene*. Glanville Frazer's home at the time was approximately 100-150 feet down the street and another 50-75 feet to the right and off the street from where Abigail Schnell-O'Connell, and Aaron Ferguson saw the assailant flee. The person described by Abigail Schnell-O'Connell, and Aaron Ferguson fled the scene and never detoured or deviated from their sight until he entered a waiting vehicle. Moreover, Aaron Ferguson testified that he knew "Kamal Thomas" and the

individual he saw fleeing from the scene had a "build" similar to that of Kamal Thomas.[24]

Additionally, other key prosecution witnesses, who implicated Defendant Ward, were individually and consecutively impeached or found to have ulterior motives for giving testimony that was adverse to Defendant Ward.

Before deliberating, the Court instructed the jurors that they were to weigh the evidence and after doing so, they could accept all or any part of a witnesses' testimony or disregard all or any part of it. In rendering a guilty verdict against Defendant Jahlil Ward, it is apparent that the jurors had to have accepted the testimony of Glanville Frazer, Jo'Nique Clendinen, Jamal Jackson, and Ashanti Leslie, while rejecting the testimony of Abigail Schnell-O'Connell and Aaron Ferguson.

Additionally, the Court notes that the People, perhaps ill-advisedly, removed the "aiding and abetting" reference from the Fifth Amended Information, thus depriving the jury of such an instruction. The Court's typical aiding and abetting instruction is as follows:

> To "aid and abet" means to intentionally help someone else commit a crime. To establish aiding and abetting, the People must prove beyond a reasonable doubt that: (1) someone else committed the charged crime; and (2) the defendant [willfully] associated himself in some way with the crime; and (3) the defendant [willfully] participated in it, as he would in something that he wished to bring about. This means that the People must prove that [defendant] consciously shared the other person's knowledge of the underlying criminal act and intended to help him. Defendant *need not to perform* the underlying criminal act, be present when it is performed, or be aware of the details of its execution to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

---

[24] Defendant Kamal Thomas, a co-defendant in the prior consolidated trial, was acquitted of all homicide charged in the first trial. *See People v. Kamal Thomas*, Crim No. ST-07-CR-298, 2010 V.I. LEXIS 51 (2010).

■ Having abandoned the theory of "aiding and abetting" as well as the *Pinkerton* theory which is inextricably intertwined with the "aiding and abetting" theory but having a conspiracy component, the "single assailant" theory is *flawed. See Pinkerton v. United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).[25]

■ In review of the case *sub judice*, the Court concludes that without direct evidence of unlawful conduct or evidence of "aiding and abetting" by Defendant Ward, the People's evidence connecting Defendant Ward to the murder of James Cockayne is "paper thin." Even if the "aiding and abetting" or "*Pinkerton*" theory were relied upon, the People would be hard pressed to show who was the "active participant(s)" since Kamal Thomas and Anselmo Boston were found not guilty of any homicide charges in the first consolidated trial. It is also significant that after almost a year of investigation by the Virgin Islands Police Department, and investigation by the C-2 Intelligence and Training Inc, a private independent investigation outfit based in Florida and paid $50,000 or more by the Cockayne family, Defendant Ward was never considered a suspect in the murder of James Cockayne until new counsel for Kamal Thomas turned over statements to the People from witnesses who suddenly surfaced and allegedly heard, each on separate occasions, Defendant Ward "confess" to killing James Cockayne.[26] Given the foregoing, the Court finds that the verdict was against the weight of the evidence.

## C. A Serious Miscarriage of Justice Will Occur If the Defendant's Conviction Stands.

Even though the Court found that the verdict was against the weight of evidence, the Court is mindful that under the *Stevens* test, that alone is insufficient to order a new trial. The Court must additionally determine the applicability of the second prong of *Stevens*.

---

[25] Although the *Pinkerton* theory is rather convoluted and confusing, it is nonetheless common law and applies to the U.S. Virgin Islands under *United States v. Lopez*, 271 F.3d 472 (3d Cir. 2001). In *Pinkerton*, the Supreme Court held that the government may prove the guilt of one defendant through the acts committed by another within the scope and in furtherance of a conspiracy. *Pinkerton*, 328 U.S. at 647-648. In *Lopez*, the Court held that not only does the *Pinkerton* theory apply to the Virgin Islands but a conspiracy charge need not be included in an Information for the theory to be advanced nor does the Defendant have to be an "active participant." *Lopez*, 271 F.3d at 480.

[26] *See* William Cockayne's trial testimony on December 15, 2009.

■ Under the second prong of the *Stevens* test, the Court must determine whether a serious danger that a *miscarriage of justice will occurr* if Defendant Ward's conviction stands. *See Stevens supra,* 52 V.I. at 305-306. Applying the law to the facts of the case *sub judice,* the Court is persuaded that allowing Defendant Ward's verdict to stand would create a serious danger of miscarriage of justice because there is no reliable direct evidence of Defendant Ward's involvement in any of the offenses set forth in the Information against him,[27] and the evidence that was offered to tie the Defendant to the offenses are *uncorroborated,* ambiguous, and post-offense purported confessions.

■ It is well recognized that a defendant may not be convicted on his own uncorroborated confessions.[28] *See Government of the Virgin Islands v. Hoheb,* 777 F.2d 138, 141 (3d Cir. 1985). "A confession is an acknowledgement in expressed words, by the accused in a criminal case, of the truth of the guilty fact charged or of some essential part of it." *Opper v. United States,* 348 U.S. 84, 91, n.7 75 S. Ct. 158, 99 L.Ed. 101 (1954). "Confessions are only one species of admissions; and all other admissions than those which directly touch the fact of guilt are without the scope of the peculiar rules affecting the use of confessions." *Id.* Exculpatory statements by a defendant, denying guilt, can not be confessions. *Id.* (quoting, Wigmore, EVIDENCE § 821 (3d. 1940).[29] The purpose of this rule is to discourage "errors in convictions based upon untrue confessions." *Government of the Virgin Islands v. Harris,* 938 F.2d 401, 409 (3d Cir. 1991); quoting *Warszower v. United States,* 312 U.S. 342, 61 S. Ct. 603, 85 L. Ed. 876, (1941).

---

[27] No weapon has been discovered or retrieved; no DNA evidence or any other forensic evidence has linked Defendant Ward to this murder.

[28] The terms "confession" and "admissions" are used interchangeably.

[29] In *Government of the Virgin Islands v. Harris,* 938 F.2d 401 (3d Cir. 1991), the Court, in adopting the trustworthiness doctrine, states that the *Opper* court's holding is as follows: "confessions, admissions, and exculpatory statements must be corroborated by 'substantial independent evidence which would tend to establish the trustworthiness of the statements' ". However, the *Harris* court improvidently misstated *Opper's* holding by including "exculpatory" statements since the *Opper* court clearly explains that exculpatory statements by a defendant *falls outside the species of admissions* that require corroboration. *See Opper v. United States,* 348, U.S. 84, 91, n.7, 75 S. Ct. 158, 99 L. Ed. 101 (1954). This error is further made apparent since *Harris* noted that "[t]he majority of courts rely on *Opper's* broad definition of "confessions." *Harris,* 938 F.2d at 409, n. 5.

In the past, the courts have disagreed as to the amount and quality of corroboration required. While some jurisdictions mandated corroboration to provide independent proof of *corpus delicti*[30] or of a commission of a crime, others have adopted a more flexible "trustworthiness" approach. *See Harris*, 938 F.2d at 409-410, *United States v. Abu Ali*, 528 F.3d 210, 235 (4th Cir. 2008). *United States v. Irving*, 452 F.3d 110, 118 (2d Cir. 2006).

 In *Opper v. United States*, 348 U.S. 84, 93 (1954), the Supreme Court resolved this question for federal courts by rejecting the *corpus delicti* rule and adopting the trustworthiness doctrine, which was later adopted by the 3rd Circuit Court of Appeals. *See Government of the Virgin Islands v. Harris*, 938 F.2d 401, 410 (3d Cir. 1991); *United States v. Wilson*, 436 F.2d 122 (3d Cir. 1971), *cert. denied*, 402 U.S. 912, 91 S. Ct. 1393, 28 L. Ed. 2d 654 (1971). Under the trustworthiness doctrine, a defendant's post-offense confessions, admission, and other incriminating statements *must* be corroborated by *substantial independent evidence* which would tend to establish the trustworthiness of the statement. *Id. See Harris*, 938 F.2d at 410.

 Independent evidence adequately corroborates a confession if it "supports essential facts admitted sufficiently to justify a jury's inference of the truth." *Id.* In other words, those facts admitted coupled with "other evidence besides the admission [or confession] must be, of course, sufficient to find guilt beyond a reasonable doubt." *Id.* In *Smith v. United States*, 348 U.S. 147, 75 S. Ct. 194, 99 L. Ed. 192 (1954), the Court further explained that "corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed and the evidence proves beyond a reasonable doubt that [the] defendant is guilty." *Id.* at 156. Thus, the government must establish each element of an offense and may do so "by independent evidence or *corroborated* admissions." *Id.*

 The quality and type of independent evidence necessary to corroborate a confession depends on the facts of the case. For example, in

---

[30] Generally, the *corpus delicti* doctrine is understood as "the body of the crime or the substance of the crime charge." Under this doctrine, a prosecutor must prove the following: (1) an injury or harm and (2) the harm or injury was caused by the defendant's criminal activity. *See Government of the Virgin Islands v. Harris*, 938 F.2d 401, 408 (3d Cir. 1991).

*United States v. Wilson*, 436 F.2d 122 (3d Cir. 1971), the court held that parts of the Defendant's confession regarding his purchase of a Dodge Charger and being stopped by a police officer in California was corroborated by other independent evidence. *Id.* at 124. The Court reasoned that "since two parts of [defendant's] admissions were corroborated by other evidence, [testimony of the car sales agent and an FBI agent] this established trustworthiness of the entire admission and authorized the prosecutor to prove the element of interstate transport solely by [the defendant's] admission that he drove the Dodge Charger from Philadelphia to California." *Id.*

 When a defendant's confessions or admissions constitute the *only evidence* linking the defendant to the criminal conduct, courts have found these statements to be untrustworthy to sustain a conviction and reversed. *United States v. Stephens*, 482 F.3d 669, 672 (4th Cir. 2007) (noting that the government presented "no evidence other than [defendant's] statement to establish his connection to a drug conspiracy or any drug trafficking crime"); *United States v. Bryce*, 208 F.3d 346, 356 (2d Cir. 2000) (concluding that the "absence of corroboration by independent evidence, [the defendant] may not be convicted . . . on the basis of these inculpatory statements"); *United States v. Fearn*, 589 F.2d 1316, 1326 (7th Cir. 1978) (holding that "[t]here was no substantial, or even slight evidence, other than the admission . . . which tends to show that the defendant was guilty beyond a reasonable doubt").

 Additionally, numerous statements by a defendant can not corroborate one another. *Washington v. Aten*, 79 Wn. App. 79, 900 P.2d 579, 585 (1995). *Each* confession by a defendant must be corroborated by *substantial independent evidence* to be admissible at trial. *See United States v. Northrup*, 482 F. Supp. 1032, 1038 (D.C. Nev. 1980) (stating that "[i]f two admissions, in and of themselves are untrustworthy, obviously they can not be bootstrapped together to raise each other to the level of trustworthiness."); *Duncan v. State*, 64 Md. App. 45, 494 A.2d 235, 239 (1985) ("multiple confessions by an accused cannot corroborate each other.").

In the case *sub judice*, the jury found Defendant Ward guilty of the murder of James Cockayne based on the evidence presented at trial. Given the evidence at trial, the People solely relied on the testimony of Glanville Frazer, Ashanti Leslie, Jo'Nique Clendinen and Jamal Jackson, to connect Defendant Ward to the murder of James Cockayne. It is also

367

not likely that three of these witnesses would only surface *almost a year after* the murder. Since Defendant Ward pleaded not guilty to murder and all other charges in the Information, the trustworthiness and reliability of his alleged "admissions" is required. The Court is not persuaded that the People have met this burden.

*The circumstances under which each Government witness testified as to Defendant Ward's purported "confession" are highly suspect. An analysis of each is as follows*:

### Glanville Frazer

Glanville Frazer testified that on the night of the incident, Defendant Ward appeared shortly after midnight at his apartment door. According to Frazer, Defendant Ward stated that he "F--up, a White Boy" and needed a ride home. Frazer further testified that while talking to Defendant Ward, he noticed spots of blood on his white sneakers.

In this instance, Defendant Ward's alleged statement to Glanville Frazer and Frazer's alleged observations are untrustworthy for the following reasons: (1) the statement is vague and it does not explain what the declarant is admitting to; (2) the statement is uncorroborated by independent evidence; (3) no shoes or pants were ever produced at trial; and (4) the statement that spots of blood were observed on Defendant Ward's shoes is a conclusion that has not been substantiated by DNA testing or any forensic or chemical test. Consequently, what Glanville Frazer alleges he saw at midnight and described as spots of blood could have just as easily been ketchup, hot sauce, or some type of red colored beverage stain.[31]

Assuming *arguendo* that Glanville Frazer's testimony has a modicum of trustworthiness, the Court finds that new "*Brady*" violations were committed by the People. Ostensibly, counsel for Defendant Kamal Thomas in Case No. ST-07-CR-298 and ST-07-CR-299 solicited statements from witnesses, who later testified for the People essentially against Defendant Ward. Before calling Glanville Frazer as a witness on behalf of the People during the first and second trial, the prosecutor knew

---

[31] In an affidavit supporting Ward's arrest warrant, Glanville Frazer states that he noticed blood on Defendant's pant on the night of the incident; however at trial, Frazer testified seeing blood on the Defendant's shoes.

that what he would testify to could subject him to two major felonies, to wit: accessory-after-the-fact, in violation of V.I. CODE ANN. tit. 14 § 12(a) and misprision of a felony, in violation of V.I. CODE ANN. tit. 14 § 13. The record however is bereft of the prosecutors or any of law enforcement officers advising Glanville Frazer of his rights before he testified. Furthermore, there is no record as to whether the People granted Glanville Frazer immunity from the felonious activities in exchange for his testimony. The implication is however that was there was a *quid pro quo* which was not disclosed to counsel for Defendant Ward.

Furthermore, the Department of Justice knew Glanville Frazer was sentenced on February 9, 2006 to *inter alia* three (3) years probation and a two (2) years suspension of his driver's licenses. *See People of the Virgin Islands v. Glanville Frazer*, Case No. ST-05-CR-354. Thus, on June 19, 2007, when Frazer purportedly got up out of his bed to drive someone who allegedly "F--ed up, a White Boy", he had no driver's license. Again, there appears to be no record of this *"Brady"* information having been sent to counsel for Defendant Ward.

Additionally, at the time Glanville Frazer allegedly drove Defendant Ward out of the area, after Ward admitted to committing an offense, Frazer knew or should have known that Defendant Ward was a convicted felon. *See* Judgment and Commitment in *People of the Virgin Islands v. Jahlil Ward*, Case No. ST-06-CR-168. Since Frazer was on probation from February 9, 2006 to February 8, 2009, he was subject to standard probation conditions which include:

- The Probationer shall not associate with any persons engage in criminal activity and shall not associate with any person convicted of a felony unless granted permission to do so by the Probation officers;

- The Probationer shall refrain from excessive amounts of alcohol and shall not purchase, possess, use, distribute or administer any narcotics or other controlled substances . . . except as prescribed by a physician.

To add insult to injury, on at least two (2) occasions, Glanville Frazer was summoned to the Court for revocation of his probation in connection with his continued illegal use of a controlled substance. On the last occasion, which was before the second trial herein, the prosecutor pleaded with this Court to be lenient to Frazer *because he was a key Government*

369

*witness* in this case. An excerpt from the last revocation hearing on January 19, 2009 reads as follows:

\* \* \* \*

THE COURT: All right, Attorney Dick?

ATTORNEY DICK: *Your Honor. I also had an opportunity to speak with Attorney Renee Gumbs-Carty regarding this matter. Mr. Frazer was a fact witness for her in a trial, a murder trial, recently. I think, before Your Honor — I believe it was your case — in which she described him as very cooperative, very helpful witness. Obviously, he helped the People in getting a conviction on that matter.*

*Normally, when they are in violation of these orders and the judge, and Your Honor has given them a break or a chance. I would say if they don't comply put them in the Bureau of Corrections. **But I think under the circumstances of this case** Mr. Frazer's life will be at risk if he's put in the Bureau of Corrections. I don't agree with —*

THE COURT: How many facilities do you have here?

ATTORNEY DICK: Excuse me?

THE COURT: How many facilities do you have here in St. Thomas?

ATTORNEY DICK: Well, we have one in St. Thomas and one in St. Croix.

THE COURT: And they have another one here; don't you.

ATTORNEY DICK: Well, that's true. But I think the fact of —

THE COURT: I was concerned because I know the other one is up there. But you all control Corrections. And he has less than a year, so he shouldn't be in this facility. And make sure that they are not in the same one. I would definitely make sure that they are not in the same one.

ATTORNEY DICK: Well, Your Honor, I don't think that — I think Mr. Frazer — *overall we're willing to give him a break.*

370

THE COURT: You're willing to, but it's my order.

ATTORNEY DICK: I know it's your order.

THE COURT: *This is the second time that my order has been ignored.*

ATTORNEY DICK: Well, you know apparently the financial aspects of it can be taken care of by today. He is willing to attend substance abuse counseling.

THE COURT: I did not tell him about that *because I told him for the second time that if he is positive at any time what would have happened, and I still gave him another chance.* You know, I'm sitting over here having empty order.

ATTORNEY DICK: I understand, Your Honor.

THE COURT: You know, I don't care whether he wants to go to rehab, but somebody can't tell me that they're going to do what they want to do.

ATTORNEY DICK: And I understand —

THE COURT: And if he can't do it because he can't help himself then he needs to check himself in.

ATTORNEY DICK: Well, that's why I was asking about the possibilities of the Village or some other kind of program.

THE COURT: Yes, I can go along with that. He said he's too old for it.

ATTORNEY DICK: I would think that that would be preferable to putting him in the Bureau of Corrections. **As they said, you know, Mr. Frazer was helpful to us in a very serious case situation, and we believe he deserves some credit, some credit and some consideration for that.** And, you know, I'm willing to, in this one, at least from our perspective — I mean, obviously, the Court, it's your order and he had violated your order. *We're willing the work out some kind of alternative other than in prison — extending the probation,* perhaps having

371

him referred to the Village, if the Court feels that would be best, or if the substance abuse clinic for regular counseling can work.

*But I just don't feel comfortable recommending, in this particular case, the Bureau of Corrections for this case.* I didn't have any problems with the last one, you know, Mr. Charleswell.

THE COURT: Because he didn't help you out with anything.

ATTORNEY DICK: Right. But he's just so blatant. He blatantly, you know —

THE COURT: You all have your own agenda.

ATTORNEY DICK: Well, no. But also — yeah, I mean, I think there has been some partial compliance by Mr. Frazer in this case, unlike Mr. Charleswell who did nothing that virtually was ordered by the Court. And I think the fact that a paternity issue is not obviously, really, per se, his fault at this point, although he does have the right if he wants to — and we would certainly advise — he can go to Paternity and Child Support's address, try to get paternity establish if he would like to do that.

*But that will be the recommendation, for some other alternative than just throwing him in the Bureau of the Corrections.*

THE COURT: Okay.

\* \* \* \*

 It appears that this *Brady* disclosure was never disclosed to counsel for Defendant Ward regarding Frazer's probation violation and the People's recommendation of leniency during a probation revocation hearing because of his "cooperation" in the prosecution against Defendant Ward.[32] Additionally, there was no indication as to whether the People

---

[32] The Court notes that a prosecutor's nondisclosure of evidence concerning the credibility of a witness fells within the scope of *Brady*. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). Even promises made by the government to a prosecution witness in exchange for their testimony must be disclosed since it directly relates to the

gave immunity to Glanville Frazer from the prosecution regarding accessory-after-the-fact and misprision of a felon.

### Jo'Nique Clendinen

Jo'Nique Clendinen, who was at Frazer's apartment during the time of Defendant Ward's visit, testified that Defendant Ward stated that he "F--up, a White Boy" and needed a ride home. According to the record, Frazer then used Clendinen's car to take Defendant Ward home.

Clendinen further testified that, she and Defendant Ward had a hostile relationship, despite being relatives. Additionally her live-in companion, Glanville Frazer, had previous altercations with Defendant Ward concerning her, which increased the couple's bitterness against Defendant Ward. Giving these acknowledged biases, it seems unlikely that Clendinen would allow Frazer to drive her car with a suspended driver's license to assist Defendant Ward in an "escape."

Assuming *arguendo* Clendinen's testimony was believable, her assistance to Defendant Ward would subject her to aiding and abetting in two (2) major felonies, to wit: accessory-after-the-fact, in violation of V.I. CODE ANN. tit. 14 § 12(a) and misprision of a felony, in violation of V.I. CODE ANN. tit. 14 § 13 since she allegedly heard Defendant Ward say that he "F--ed up, a White Boy and needed a ride out of the area. Instead of reporting the offense to the police, she allowed Frazer to drive her car to assist Defendant Ward. The record is bereft of information that the prosecutors or any law enforcement officer advising Clendinen of her rights at any time or disclosing whether she was given immunity in exchange for her testimony.

### Ashanti Leslie

Ashanti Leslie testified that during a conversation with Defendant Ward a day after the murder of James Cockayne, Defendant Ward stated that he "killed a white boy." She also testified that Defendant Ward "held his gym shoes/sneakers in his hands," exposing the bloody soles of his shoes/sneakers. Leslie also claims that Defendant Ward had a knife which she saw the day after the murder and that Defendant Ward boasted that he

---

credibility of the witness. *See Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

used it in the fight. No evidence has been presented to corroborate Ward's confession made to Leslie or her observation regarding the knife he had. Again no shoes or knife have been produced nor was any DNA found or any forensics test results produced to corroborate that what was on the soles of the gym shoes allegedly worn by the Defendant Ward the day after the incident was blood nor was any knife been produced.

Furthermore, testimony disclosed there was animosity between Ashanti Leslie and Defendant Ward[33] and the testimony of Ashanti Leslie during the second trial was in direct conflict with testimony given by her in the first trial.

### Jamal Jackson

Jamal Jackson testified that a few days after the homicide, he told Defendant Ward "They say you do that thing the other night," and Ward responded "Yeah, nobody seen me do it." No sufficient evidence has been presented to corroborate this confession and without more information this alleged statement by Defendant Ward is ambiguous. If Defendant Ward did make that statement, it could either be interpreted as an acknowledgement that Ward knew individuals were accusing him of the murder of James Cockayne or a statement admitting that he killed James Cockayne. Also like Ashanti Leslie and Jo'Nique Clendinen, Jamal Jackson harbored animosity against the Defendant and it was implied from the first trial that Jamal Jackson supplied the firearm to Denzel Stevens, the individual who shot Defendant Ward in 2006.

 In sum, the People have attempted to impermissibly corroborate untrustworthy and biased testimony regarding Defendant Ward confessing to the murder of James Cockayne by "bootstrapping" that testimony with equally untrustworthy and biased testimony regarding confessions allegedly made by Defendant Ward. Moreover, new and blatant *"Brady"* violations appear to have been committed by the People.

---

[33] The Court notes that Ashanti Leslie's animosity toward Defendant Ward may be due to their past relationship with Kamal Thomas. At trial, Ashanti Leslie testified that she and Defendant Ward had a relationship, which ended sourly when the Defendant Ward was off-island, in the Witness Protection Program. Leslie also admitted that during this time, she met Kamal Thomas, who was a prior co-defendant in this matter. When asked to clarify the nature of her relationship with Kamal Thomas, Leslie refused.

## V. CONCLUSION

Defendant Ward had sufficient tools before and during the second trial to cure or counter the egregious conduct engaged into by the People surrounding Daryl Martens' testimony. Furthermore, other exculpatory evidence unrelated to Daryl Martens' testimony was made available to the Defendant but evidently not utilized due to "trial strategy." Hence, Defendant Ward's Sixth Amendment rights to a fair trial and compulsory process were not violated, and the Court must therefore declines to exercise its supervisory power to dismiss the Information against Defendant Ward on those grounds.

With respect to Defendant Ward's motion for a new trial, the Court, in exercising its own independent judgment, concludes that not only was the verdict against the weight of the evidence but a serious miscarriage of justice will occur if Defendant Ward's conviction stands since the verdict is hinged on uncorroborated confessions allegedly made by Defendant Ward to a series of individuals, whose testimony was impeached and who each had a bias against Defendant Ward. Finally, new *Brady* violations have surfaced that seriously undermine the integrity of the prosecution.

Accordingly, given the forgoing, a serious danger that a miscarriage of justice will occur if Defendant Ward's conviction is allowed to stand hence the motion for new trial is **GRANTED**.